THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. BRYAN WATTERS, Defendant-Appellant.

Fifth District   No. 5—90—0719

Opinion filed July 9, 1992.

Clyde L. Kuehn, of Kuehn & Trentman, of Belleville, for appellant.

Robert Haida, State's Attorney, of Belleville (Norbert J. Goetten, Stephen E. Norris, and Debra A. Buchman, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE CHAPMAN delivered the opinion of the court:
"Lennie said, 'Tell how it's gonna be.'
George had been listening to the distant sounds. For a moment he was business-like. 'Look acrost the river, Lennie, and I'll tell you so you can almost see it.'

\* \* \*

'Go on,' said Lennie. 'How's it gonna be. We gonna get a little place.'

'We'll have a cow,' said George. 'An' we'll have maybe a pig an' chickens \*\*\* an' down the flat we'll have a \*\*\* little piece alfalfa—'

'For the rabbits,' Lennie shouted.

'For the rabbits,' George repeated.

'And I get to tend the rabbits.'

'An' you get to tend the rabbits.'

Lennie giggled with happiness, 'An' live on the fatta the lan'.'

Lennie turned his head.

'No, Lennie. Look down there across the river, like you can almost see the place.'

\* \* \*

Lennie said, 'I thought you was mad at me, George.'

'No,' said George. 'No, Lennie. I ain't mad. I never been mad, an' I ain't now. That's a thing I want ya to know.'

\* \* \*

Lennie begged, 'Let's do it now. Let's get that place now.'

'Sure, right now. I gotta. We gotta.'

And George raised the gun and steadied it, and he brought the muzzle of it close to the back of Lennie's head. The hand shook violently, but his face set and his hand steadied. He pulled the trigger. The crash of the shot rolled up the hills and rolled down again. Lennie jarred, and then settled slowly forward to the sand, and he lay without quivering."[1]

Steinbeck's story is a familiar one; Lennie with his giant's strength and damaged brain; George, small and sharp, but caring for Lennie and their dream of a place of their own where Lennie could care for the rabbits. Lennie's brain did not differentiate between the death of the little mice he petted too hard and the broken neck of Curley's wife with the long blond curls. George chose not to let Lennie die at the hands of the mob led by Curley. George's sentence was approved by Slim, the jerkline skinner, in a few simple words, "You hadda George. I swear you hadda."

In this case we are asked to review a minimum six-year sentence on a Class X crime. The trial court specifically found that the defendant would be eligible for probation and stated, "Because of all the factors that I have enumerated \*\*\* the court should grant \*\*\* leniency

---

[1] J. Steinbeck, Of Mice and Men (1937).

as much as can be given," but it concluded that mandatory sentencing provisions of section 5—5—3(c)(2)(C) of the Unified Code of Corrections (Ill. Rev. Stat. 1989, ch. 38, par. 1005—5—3(c)(2)(C)) precluded a sentence of probation. We reverse and remand.

While examining the law in this case we are drawn to review the history of punishment in general and the development of probation as a viable concept in our system of penology.

"Punishment" has been defined in terms of five elements:

"(i) It must involve pain or other consequences normally considered unpleasant.

(ii) It must be for an offence against legal rules.

(iii) It must be of an actual or supposed offender for his offence.

(iv) It must be intentionally administered by human beings other than the offender.

(v) It must be imposed and administered by an authority constituted by a legal system against which the offence is committed." H.L.A. Hart, Punishment and the Elimination of Responsibility 5 (1968).

Corporal punishment and imprisonment were the sentences of choice in early America for those convicted of crime. Instruments such as the stocks, pillory, scarlet letter, and other devices for torture and debasement were used regularly. (A. Wood & J. Waite, Crime and Its Treatment 462-63 (1941).) The Quakers were instrumental in implementing reforms in the early criminal code. For instance in 1682, under the guidance of William Penn, "imprisonment at hard labor in 'houses of correction' was substituted for death for all crimes except murder, and for the barbarous corporal punishments." (Crime and Its Treatment, at 492.) When Quaker rule came to an end in 1718, their reform efforts were curtailed. Accounts are told of the institution of 13 capital offenses, with whipping, branding and mutilation for lesser crimes. In the late 18th century, the ideas of humane penology idealized by William Penn were adopted by "The Philadelphia Society for Relieving Distressed Prisoners," which is said to be the first prison association in America. (Crime and Its Treatment, at 493.) The society advocated the separation of hardened criminals from first offenders, chapel services for prisoners, the separation of witnesses awaiting trial from convicts, the separation of the sexes in prison, and other reforms. (Crime and Its Treatment, at 494.) Efforts at improvement were slow. Massachusetts was the first State to enact a provision for probation in 1878. (Crime and Its Treatment, at 632.) During probation's development as a recognized sentencing alternative, the United

States Supreme Court opined, "Probation is the attempted saving of a man who has taken one wrong step and whom the judge thinks to be a brand who can be plucked from the burning at the time of the imposition of the sentence." (*United States v. Murray* (1928), 275 U.S. 347, 358, 72 L. Ed. 309, 313, 48 S. Ct. 146, 149.) Probation involves the supervision of the convicted offender in the community *in lieu* of his having to serve a sentence in a penal institution. (Crime and Its Treatment, at 630.) By 1938, statutes authorizing probation for adults had been enacted in 37 States. Crime and Its Treatment, at 633.

That the punishment should fit the offender and not merely the crime became the prevalent philosophy of penology.

> "The belief no longer prevails that every offense in a like legal category calls for an identical punishment without regard to the past life and habits of a particular offender. This whole country has traveled far from the period in which the death sentence was an automatic and commonplace result of convictions—even for offenses today deemed trivial. Today's philosophy of individualizing sentences makes sharp distinctions for example between first and repeated offenders. Indeterminate sentences, the ultimate termination of which are sometimes decided by non-judicial agencies have to a large extent taken the place of the old rigidly fixed punishments. The practice of probation which relies heavily on non-judicial implementation has been accepted as a wise policy." (*Williams v. New York* (1949), 337 U.S. 241, 247-48, 93 L. Ed. 1337, 1343, 69 S. Ct. 1079, 1083-84.)

Today the concept of individualized sentencing treatment is an important factor in our system of penology. *People v. Boclair* (1989), 129 Ill. 2d 458, 494, 544 N.E.2d 715, 731; *Lockett v. Ohio* (1978), 438 U.S. 586, 605, 57 L. Ed. 2d 973, 990, 98 S. Ct. 2954, 2965.

While there has been some recognition of the benefits of the individualization of sentencing, our society is only beginning to understand the plight of the mentally retarded.

> "The more severely retarded have often been warehoused because traditional prejudments have left their potential unrecognized. [Citation.] Even today many severely retarded persons are placed in remote state institutions where they receive mere custodial care." (Rizzo, *Beyond Youngberg: Protecting the Fundamental Rights of the Mentally Retarded*, 51 Fordham L. Rev. 1064, 1064 n.7 (1983).)

What is done to offenders against custom or law, and why it is done, are aspects of the state of culture of a given social group. (Crime and Its Treatment, at 445.) Hopefully we have come further than the summary disposition of mentally disabled criminal defendants like Steinbeck's Lennie. J. Steinbeck, Of Mice and Men (1937).

Defendant Bryan Watters appeals his sentence of imprisonment from a judgment of guilty but mentally ill on a charge of aggravated criminal sexual assault, a Class X felony. He contends that, under the circumstances of his case, the mandatory prison provisions for Class X offenses should not apply.

On or about September 16, 1988, Bryan Watters and three neighbor children engaged in various sexual acts and photographed one another in the process of such conduct. Defendant took the film to Smith's Pharmacy for development, the store called the police department, and defendant was indicted on three counts of child pornography (Ill. Rev. Stat. 1987, ch. 38, par. 11—20.1(a)(4)) and three counts of aggravated criminal sexual assault (Ill. Rev. Stat. 1987, ch. 38, par. 12—14(b)(1)).

The court conducted a hearing to determine defendant's fitness to stand trial, and on January 5, 1990, the court entered an order

"that despite the defendant's diagnosis of [m]ild [m]ental [r]etardation, he is able to understand the nature and purpose of the proceedings against him, and can, within a limited range, assist in his defense, even though he may not be able to plan a defense or thoroughly understand all of the complexities of a defense or thoroughly understand all of the complexities of a trial or possible legal issues or theories that may be raised."

The court further ordered that the following special procedures would be observed during the course of the trial:

"1. The Court may limit the State in asking leading questions of the defendant in cross[-]examination should defendant elect to testify.

2. Defense counsel shall be allowed sufficient recesses during the course of the trial to confer with defendant concerning defendant's ability to understand each phase of the trial. Only at defense counsel's request, the [c]ourt would participate in any such conferences.

3. If during the course of the trial or any conference regarding defendant's ability to understand the proceedings defense counsel believes defendant is unable to understand the proceedings, or should defendant's anxiety level cause him to so decompensate that he becomes unable to assist in his de-

fense or understand the proceedings, then, at the request of defense counsel, the [c]ourt will consider the appointment of Dr. Daniel J. Cuneo to assist defendant in understanding the proceedings pursuant to Illinois Revised Statutes Chapter 38, Section 104—22 [sic]."

On May 11, 1990, the trial court amended paragraph three of its January 5, 1990, order and allowed defendant to have an expert assist him during the course of proceedings commensurate with the court's previous order and section 104—22.

A stipulated bench trial was held July 3, 1990, on count VI of the indictment. All other counts were dismissed.

At the stipulated bench trial, the State submitted that if a trial were held the State would be prepared to present evidence to support a conviction against the defendant. The State was prepared to call the owner of Smith's Pharmacy who, on October 1, 1988, contacted the police department and advised them that a customer, Bryan Watters, brought in a roll of film for developing which contained photographs of nude and semi-nude children posing in sexually explicit positions. The police arrested defendant when he came to pick up the photographs on October 1, 1988.

The State informed the court that defendant gave a statement to the police wherein defendant indicated that two weeks prior to his arrest three neighborhood children, two boys and a young girl, were at his house. Defendant disrobed and had the children undress as well. Defendant admitted to knowing that the children were under 10 years of age. He advised the police that he had been photographing them for four to six weeks. The photographs were confiscated by the police and depicted, among other things, the young girl in sexually explicit positions with the defendant. Three of the photographs depicting the girl and defendant were admitted into evidence.

The State advised the court that if a trial was held it would call Jane (an assumed name for purposes of this appeal), the young girl depicted in defendant's photographs. The State would also call Tish LaRock, a nurse at Cardinal Glennon Hospital in St. Louis, who would testify that she interviewed Jane and was advised by her that Bryan Watters had placed his penis in her vagina. Jane's brothers, the two boys defendant photographed, would testify that they saw Jane engage in sexual contact with the defendant. Dr. James Monteleone, a physician and expert in the field of child abuse, would testify that he examined Jane and in his expert opinion Jane was the victim of chronic sexual abuse. At the time of the offense Jane was four years

of age. Her brothers were seven and eight years old. The defendant's date of birth is July 6, 1960.

Finally, the State was prepared to call Dr. Michael Armour, a clinical psychologist, who would give his opinion that the defendant was legally sane at the time of the offense and understood the wrongfulness of his actions. It was also Dr. Armour's opinion, based on defendant's mild retardation, that defendant was mentally ill but not insane at the time of the offense.

Defendant's attorney advised the court that in the event of a trial the defendant was prepared to call as an expert Dr. Daniel Cuneo, a clinical psychologist, to develop the mental and social history of Bryan Watters. In particular, the defense was prepared to demonstrate that defendant has always had an IQ in the range of 64 to 67; that he functioned with certain limitations throughout life; that he has lived a major portion of his life with his mother; that he has had experiences with a girl friend; that during the recent past he has been employed at the Ben Franklin store in Belleville; and that he otherwise functions normally within his day-to-day life notwithstanding his mental deficiency. Counsel for the defendant further argued that Dr. Cuneo would testify that in his expert opinion defendant did not appreciate that the acts he was committing were of a criminal nature at the time of the offense. Defendant's attorney concluded that basically his defense would be that defendant suffered from a mental illness and was not capable of understanding the wrongfulness of his behavior.

The trial court found Bryan Watters to be guilty but mentally ill of aggravated criminal sexual assault. On September 26, 1990, a sentencing hearing was held. The State presented no evidence. The defendant called several witnesses in mitigation.

Dr. Michael Armor testified that he was called upon by the St. Clair County State's Attorney's office to conduct an evaluation of Bryan Watters' sanity at the time of the alleged offense. He testified that he was familiar with the Illinois law of guilty but mentally ill and the legal definitions of mental illness. Dr. Armor concluded that at the time of the alleged offense Bryan Watters was not legally insane, but that he was mentally ill due to his mental retardation. The doctor further testified that the defendant presents himself as a very passive individual who is very dependent upon others. Dr. Armor was of the opinion that the defendant would be easily led or intimidated by others. When asked whether he believed that prison would be a dangerous place for the defendant, Dr. Armor testified, "I think that he would be an easy victim in any kind of prison—in the prison population where he would be subject to being victimized. *** I think due to

his intellectual limitations and his passivity, he would be an easy target for ridicule and physical intimidation."

John Conkright, the owner of the Ben Franklin store where defendant has worked for six years, testified that he has known the defendant and his family since defendant was about 10 years old. Conkright described defendant's job at the Ben Franklin store as follows:

"He is my stock man, my stock boy. He comes in and sweeps the store up every morning, busted [*sic*] the boxes up. He's got a morning routine that he goes through which quite honestly we have to keep it pretty much on a routine basis. *** He basically can handle one or two assignments at a time. Not something where you give Bryan a day[']s assignment at one time. You give him one or two at the most. When he gets that done, he comes back to you and you give him more."

Conkright testified that Bryan is "very dependable, very honest." He testified that shortly after defendant was arrested, Conkright spoke with him. Conkright testified that Bryan was dumbfounded and did not understand what he had done and he did not understand how serious it was. When Conkright was asked by defense counsel whether he believed that defendant would repeat his conduct, Conkright testified, "There is no question in my mind that at this point Bryan understands that he was wrong and that in his terms he did bad and that he would not do this." Conkright also testified that he would continue to keep defendant as an employee if defendant were not sent to prison.

Bryan's mother, Doris Watters, was called to testify. She testified that except for a two-year period when Bryan lived in a trailer, he has lived with her. Doris Watters testified that her son has never been a behavioral problem and would never intentionally harm anyone. The defendant's father, Allen Lee Watters, testified that Bryan has always done what he was asked or told to do, and that he would not hurt anything.

Finally, Dr. Daniel Cuneo, director of research at the Chester Mental Health Center, Illinois' maximum security hospital, testified that he first met the defendant in 1988 when he was asked to determine whether the defendant would be an appropriate candidate for the facility's outpatient sexual offender treatment program. Cuneo testified that an evaluation was performed on Bryan Watters and he was accepted into the program. Cuneo testified that Bryan Watter's school records indicated that the defendant's IQ was consistently in the 60's range. Dr. Cuneo opined that the defendant's mental capacity affected his judgment about the conduct that he is charged with in

this case. Cuneo testified, "he knew it was wrong but he knew it was like a 10 year old steals [*sic*] that Playboy and leafs through it in the bathroom. You know it is wrong but you don't know it is criminal."

Dr. Cuneo describes the defendant as passive, dependent, easily led and easily influenced. When asked whether he feels that Bryan Watters is likely to repeat the sort of conduct with which he is charged, Dr. Cuneo testified:

> "In the current situation he is in, no. *** If Bryan is sent to prison, I would think the likelihood of him repeating the crime is high. If he continues in treatment, I would say it is low.
>
> * * *
>
> Bryan Watters is going to end up because Bryan Watters is who he is, the way he is going to survive in prison, he is either going to be made a punk or put under somebody's control and in doing so, what is going to happen is he is going to learn all kinds of stuff."

On September 28, 1990, the trial court sentenced Bryan Watters to six years' imprisonment. The court stated, "although I believe you would otherwise be eligible for probation, I do not believe that the Court can grant probation under the law as it now exists." The court remanded defendant to the Department of Mental Health and Developmental Disabilities and ordered that a hearing be conducted pursuant to the provisions of the Mental Health and Developmental Disabilities Code (Ill. Rev. Stat. 1989, ch. 91½, par. 1—100 *et seq.*).

On October 26, 1990, a hearing was held regarding civil commitment. Bonnie Walbran, a registered psychologist with specific expertise in the diagnosis and treatment of persons with developmental disabilities, testified that she evaluated Bryan Watters and assessed his adaptive behavior skills using the Inventory for Client and Agency Planning. Bryan's scores on this inventory established his behavioral age equivalency at nine years eight months. His maladaptive behavior falls within the range of a normal person his age. Dr. Walbran testified that maladaptive behavior refers to "whether you hurt other people, whether you are socially offensive, whether you engage in disruptive behavior." Dr. Walbran described two incidents which occurred while the defendant was at the Alton Mental Health and Developmental Center:

> "Bryan's mother brought him a radio and a TV over the weekend. When I came in on Monday it was reported to me that he had not used those. The first time I really got back to the unit was late on Monday, and I spoke to Bryan about why it was that he hadn't used the radio or the TV that his mother

had brought, and he told me, when I asked, that there was no electricity in his room, and inadvertently the circuit breaker had been turned off on the electricity to his room. He had been that way for two or three days and hadn't said anything to anyone about it.

Another one of the professionals asked him several days later whether he *** had had a soda, and he said, no, he hadn't had any. She asked him why. He said he had a $10 bill and he didn't want to ask anyone for change. And now at this point he's been there almost a week and he hasn't asked anyone could he change his ten dollar bill. So it seems to me that unless someone came and asked him directly did this happen to you, that he would not be likely to tell somebody. That's been— that was our experience that he did not tell us anything unless we asked him directly what happened."

Dr. Walbran further testified that because she does not believe Bryan Watters is likely to inflict serious harm on himself or on anyone else, and because he is able to care for himself, he does not meet the criteria for civil commitment to the Department of Mental Health.

Following the hearing, the trial court determined that Bryan Watters did not fit the criteria for civil commitment, denied defendant's motion to reconsider the sentence, and permitted the defendant to remain on bail pending appeal, provided he had no contact with the victims and continued the course of counseling that he was undergoing with Dr. Cuneo. Defendant appeals.

The sole issue on appeal is whether the trial court erred in finding that it was *required* to impose a sentence of imprisonment under section 5—5—3(c)(2)(C) of the Unified Code of Corrections (Ill. Rev. Stat. 1989, ch. 38, par. 1005—5—3(c)(2)(C)). Defendant argues that the trial court erroneously interpreted that section to preclude a sentence of probation where a defendant was suffering from a disability and was tried under section 104—26(c)(1) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1989, ch. 38, par. 104—26(c)(1)). Defendant contends that mandatory imprisonment for Class X offenses may yield to section 104—26(c)(1) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1989, ch. 38, par. 104—26(c)(1)).

The fundamental rule of statutory construction is to give effect to the intent of the legislature. (*Illinois v. Mikusch* (1990), 138 Ill. 2d 242, 247, 562 N.E.2d 168, 170.) Courts, when interpreting a statute, should look first to the statutory language as the best indication of the drafters' intent. *County of Du Page v. Graham, Anderson, Probst & White, Inc.* (1985), 109 Ill. 2d 143, 151, 485 N.E.2d 1076, 1079.

■ Section 5—5—3(c)(2)(C) of the Unified Code of Corrections provides:

> "A period of probation, a term of periodic imprisonment or conditional discharge shall not be imposed for the following offenses. The court *shall sentence the offender to not less than the minimum term of imprisonment set forth in this Code* for the following offenses, and may order a fine or restitution or both in conjunction with such term of imprisonment:
>
> * * *
>
> (C) A Class X felony." (Emphasis added.) Ill. Rev. Stat. 1989, ch. 38, par. 1005—5—3(c)(2)(C).

On the other hand, section 104—26(c)(1) of the Code of Criminal Procedure of 1963 provides as follows:

> "(c) A defendant convicted following a trial under Section 104—22 shall be sentenced according to the procedures and dispositions authorized under the Unified Code of Corrections, as now or hereafter amended, subject to the following provisions:
>
> (1) The court *shall not impose a sentence of imprisonment* upon the offender if the court believes that because of his disability a sentence of imprisonment would not serve the ends of justice and the interests of society and the offender or that because of his disability a sentence of imprisonment would subject the offender to excessive hardship. In addition to any other conditions of a sentence of conditional discharge or probation the court may require that the offender undergo treatment appropriate to his mental or physical condition." (Emphasis added.) Ill. Rev. Stat. 1989, ch. 38, par. 104—26(c)(1).

The State argues that the emphasized language of section 5—5—3(c)(2)(C) clearly denotes the legislature's intent that a person convicted of a Class X felony is to be sentenced to not less than a minimum term of imprisonment. The State contends that no discretionary authority was delegated to the judge as evidenced by the statute's mandatory language.

Defendant maintains that it is clear that the legislature was mindful when it adopted section 104—26(c)(1) that certain dispositions for certain crimes carry mandatory imprisonment under the Unified Code of Corrections. Defendant contends that the legislature was also aware that circumstances might arise, due to a mental disability of an offender who was not quite unfit for prosecution, that would render mandatory imprisonment unjust and abusive. Defendant argues that section 104—26(c)(1) was adopted as an escape hatch for that narrowly circumscribed class of cases where the offender suffers a dis-

ability that does not render him totally incompetent and beyond the power of criminal prosecution but does set him apart from most criminal defendants. To construe section 104—26(c)(1) to apply only to probationable offenses, defendant argues, not only ignores the plain language of the statute but renders it superfluous.

Whether a statutory provision is interpreted as mandatory or discretionary depends upon the intent of the legislature. (*People v. Porter* (1988), 122 Ill. 2d 64, 82, 521 N.E.2d 1158, 1165.) Generally, the word "shall" is indicative of a mandatory intent, but such a construction is not absolute and intent can be determined from the purpose and context of the provision. (122 Ill. 2d at 82, 521 N.E.2d at 1165.) In construing statutory provisions, the court should consider not only the language of the statute but also the reason for the law, the evils to be remedied, and the objects and the purposes to be attained. (*Faheem-El v. Klincar* (1988), 123 Ill. 2d 291, 298, 527 N.E.2d 307, 310.) While the language of section 5—5—3(c)(2)(C), on its face, appears to leave no room for discretion under any circumstances, we are mindful that the entire criminal code and each of its sections must be considered in determining legislative intent. (*People v. Hairston* (1970), 46 Ill. 2d 348, 356, 263 N.E.2d 840, 846.) Generally, statutes which relate to one subject are governed by one spirit and a single policy, and the legislature intended the enactments to be consistent and harmonious. (*People v. Maya* (1985), 105 Ill. 2d 281, 286-87, 473 N.E.2d 1287, 1290.) Therefore, in order to determine whether section 5—5—3(c)(2)(C) mandates imprisonment in this case, we must examine that statute in conjunction with section 104—26(c)(1).

We find the legislative history of Public Act 81—1217, which includes section 104—26(c)(1), of particular significance. (See Pub. Act 81—1217, eff. Dec. 28, 1979.) Public Act 81—1217 consisted of a package of legislation designed to deal with the criminal defendant who was unfit to stand trial.

> "Senate Bill 133 is a result of the case involving one Donald Lang and some of you may have seen the series on television called, 'The Dummy', which dealt with Donald Lang and his inability to be brought to trial in the State of Illinois because of the glaring gap in the present statutory framework of our criminal justice system as it relates to unfit defendants. Senate Bill 133 provides a comprehensive system for dealing with defendants who are found unfit to stand trial and it is my belief that it sets forth a rational system to deal with this type of defendant. *** All treatment is directed towards bringing the defendant to a condition where he may be found to fit [*sic*] trial ... to

stand trial. *** The Bill *** has been carefully scrutinized by the Commission on Revision of the Mental Health Code and it has been intensely scrutinized by the staff of both Members of the House and the Senate." (81st Ill. Gen. Assem., House Proceedings, June 19, 1979, at 75-76 (statements of Representative Daniels).)

After studying the legislative history, we conclude that the Act's sponsors intended that special provisions be made for unfit defendants within the criminal process. The Donald Lang case, to which Representative Daniels referred in his remarks to the legislature, provides insight into the nature of the problems faced by the developmentally and physically disabled within a criminal justice system. Because the Donald Lang case was apparently the impetus for the passage of Public Act 81—1217, we will briefly review that case.

Donald Lang is a visually impaired, illiterate deaf-mute, who was indicted November 1965 for the murder of a woman. (*People v. Lang* (1967), 37 Ill. 2d 75, 224 N.E.2d 838.) He was civilly committed to the Department of Mental Health after being found unfit to stand trial. (37 Ill. 2d at 80-81, 224 N.E.2d at 841.) Subsequently the indictment was dismissed due to the death of a principal witness, and in February 1971 defendant was released from custody. In July of 1971, Lang was indicted for the murder of a second woman. (See *People v. Lang* (1984), 127 Ill. App. 3d 313, 468 N.E.2d 1303.) Although Lang is a deaf-mute who was never taught to read or write or to use sign language and is unable to communicate with anyone, he was nevertheless tried by a jury and convicted of the murder of Earline Brown. (*People v. Lang* (1975), 26 Ill. App. 3d 648, 325 N.E.2d 305.) The appellate court reversed, holding that Lang's conviction was the result of trial procedures which could not effectively compensate for his disabilities; the cause was remanded for a determination of Lang's fitness to stand trial. (26 Ill. App. 3d at 655, 325 N.E.2d at 312.) After a fitness hearing, the trial court found Lang unfit and remanded him to the Illinois Department of Mental Health and Developmental Disabilities (Department) for a hearing into his need for hospitalization.

Lang did not meet the requirements for involuntary commitment. The trial court, thereupon, directed that the Department create and implement an adequate and humane care and treatment program for the defendant. The appellate court vacated the trial court's order because the trial court had no authority to order the Department to collaborate in the development of a program to render the defendant fit to stand trial. The appellate court concluded that the trial court had gone beyond the directive of the statute and urged that the legisla-

ture remedy the situation by implementing statutory guidelines for hospitalization to authorize treatment for the conditions which underlie or cause a defendant's unfitness to stand trial. *People v. Lang* (1978), 62 Ill. App. 3d 688, 712, 378 N.E.2d 1106, 1120, affirmed as to this issue (1979), 76 Ill. 2d 311, 391 N.E.2d 350.

The case of Donald Lang brought to the fore the dilemma of criminal defendants who are unfit to stand trial yet are not in need of mental treatment. With Lang came the recognition that the number of unfit defendants not in need of mental treatment was sufficient to compel consideration of alternatives to the legislation in existence at that time. (Fitzpatrick, *Unfit to Stand Trial: The Dilemma and a Proposal*, 60 Chicago Bar Rec. 226, 229 (1979).) Illinois' statutory scheme prior to the enactment of Public Act 81—1217 allowed for an unfit defendant to be confined. While confined, however, the defendant would not receive any special treatment to assist him in becoming fit, which suspended both the defendant and the resolution of the criminal case.

■ Included within Public Act 81—1217 is section 104—26 (Ill. Rev. Stat. 1989, ch. 38, par. 104—26), which addresses the sentencing of persons who are tried under section 104—22 (Ill. Rev. Stat. 1989, ch. 38, par. 104—22). At least one analyst has interpreted section 104—26 as presuming that persons tried under section 104—22 should not receive a sentence of imprisonment and should instead be sentenced to treatment. (See Paull, *S.B. 133: The Near Resolution of a Major Problem: Fitness in the Criminal Law*, 56 Chi. Kent L. Rev. 1107, 1120 (1980).) The language of section 104—26(c)(1) provides the trial court with discretion to either impose a sentence of imprisonment or forego such if a "sentence of imprisonment would not serve the ends of justice and the interests of society and the offender or that because of his disability a sentence of imprisonment would subject the offender to excessive hardship." Ill. Rev. Stat. 1989, ch. 38, par. 104—26(c)(1).

■ The issue here is the appropriateness of a mandatory penal disposition of an offender in the unique circumstances of this case in view of his crime and his characteristics, measured against the criteria of the governing aims and premises of the criminal law. (See S. Kadish, Blame and Punishment 253 (1987).) Considering the legislative history behind Public Act 81—1217, and the special guidelines of section 104—26(c)(1), along with the admitted evils to be remedied and the purposes to be attained by the legislature in enacting legislation with the developmentally or mentally disabled in mind, we conclude that the trial court had discretionary authority in sentencing the

defendant under section 5—5—3(c)(2)(C). Keeping in mind the purpose behind the legislature's recognition of the developmentally disabled, and the language used in section 104—26, the sentencing scheme intended by the legislature becomes clear. We believe that it was the intention of the legislature that section 104—26(c)(1) give the sentencing judge discretion when sentencing a defendant under section 5—5—3(c)(2)(C).

In recent years the question of whether capital punishment should be inflicted upon the developmentally disabled criminal defendant has been debated. *Penry v. Lynaugh* (1989), 492 U.S. 302, 106 L. Ed. 2d 256, 109 S. Ct. 2934, is the first case in which the United States Supreme Court has directed its attention to the specific issue of whether mentally retarded defendants should be excepted from the death penalty. (Dick-Hurwitz, *Penry v. Lynaugh: The Supreme Court Deals A Fatal Blow To Mentally Retarded Capital Defendants*, 51 U. Pitt. L. Rev. 699, 707 (1990).) In that case the court stated that imposing the death sentence on a mentally retarded defendant is not *per se* cruel and unusual punishment and thus does not violate the eighth amendment. (*Penry*, 492 U.S. at 334-35, 106 L. Ed. 2d at 288-89, 109 S. Ct. at 2955.)[2] The *Penry* Court, however, held the Texas sentencing statute at issue unconstitutional because it did not allow the jury to consider mental retardation as a mitigating factor in sentencing. (492 U.S. at 319-28, 106 L. Ed. 2d at 278-84, 109 S. Ct. at 2947-52.) While *Penry* dealt specifically with capital punishment, we find the Court's requirement that mental retardation be included as a mitigating factor in determining the appropriateness of the death penalty significant in the case at bar.

"Underlying *Lockett* and *Eddings* is the principle that punishment should be directly related to the personal culpability of the criminal defendant. *** *[I]t is not enough simply to allow the defendant to present mitigating evidence to the sentencer. The sentencer must also be able to consider and give effect to that evidence in imposing sentence.* ***

* * *

*** *Personal culpability is not solely a function of a defendant's capacity to act 'deliberately.'* A rational juror at the penalty phase of the trial could have concluded, in light of Penry's

---

[2]Four states reacted to the court's decision by passing legislation explicitly exempting these individuals from the death penalty. See Cohen, *Exempting the Mentally Retarded From the Death Penalty: A Comment on Florida's Proposed Legislation*, 19 Fla. St. U. L. Rev. 457, 457 (1991).

confession, that he deliberately killed Pamela Carpenter to escape detection. Because Penry was mentally retarded, however, and thus less able than a normal adult to control his impulses or to evaluate the consequences of his conduct, and because of his history of childhood abuse, that same juror could also conclude that Penry was less morally 'culpable than defendants who have no such excuse,' but who acted 'deliberately' as that term is commonly understood." (Emphasis added.) (*Penry*, 492 U.S. at 319-23, 106 L. Ed. 2d at 278-81, 109 S. Ct. at 2947-49.)

While the Supreme Court did not mandate a special exception for the developmentally disabled who are candidates for capital punishment, it did recognize the significance of their disability as a mitigating factor in sentencing.

Like the Supreme Court's pronouncement in *Penry*, section 104—26(c)(1) (Ill. Rev. Stat. 1989, ch. 38, par. 104—26(c)(1)) directs the courts to take the defendant's developmental disability into account in sentencing, and it appears to be specifically designed to safeguard against inappropriate punishment for the developmentally disabled criminal defendant. When it is considered in conjunction with section 5—5—3(c)(2)(C) of the Unified Code of Corrections (Ill. Rev. Stat. 1989, ch. 38, par. 5—5—3(c)(2)(C)), we conclude that it gives the sentencing authority discretion to tailor an appropriate sentence for the criminal defendant who qualifies under its provisions. This conclusion is consistent with the observations of one Federal court:

"Mentally retarded persons meet with unremitting hardships in prison. ***

\* \* \*

*** [T]heir usual lot is abuse, exploitation, and frequent punishment. ***

\* \* \*

*** Their special habilitation needs are practically unrecognized *** and they are subjected to a living environment which they cannot understand and in which they cannot succeed." *Ruiz v. Estelle* (S.D. Tex 1980), 503 F. Supp. 1265, 1344-46.

While the criminal acts of a mentally disabled person are not *per se* excused, our society has evolved to an understanding that because of a disability a sentence of imprisonment may "not serve the ends of justice and the interests of society and the offender" (Ill. Rev. Stat. 1989, ch. 38, par. 104—26(c)(1)). Legislatively created exceptions to mandatory imprisonment, when viewed in light of the special capacities of one with a mental disability, are not so much "excuses" but are the makings of a moral code. (S. Kadish, Blame and Punishment 87

(1987).) The scholar Hart recognized four reasons which are usually mentioned as justifying punishment: deterrence, retribution, vengeance and reform. (H.L.A. Hart, Punishment and the Elimination of Responsibility 8 (1968).) He wrote:

"The moral justification for punishment lies in its effects—in its contribution to the prevention of crime and the social readjustment of the criminal. It is essentially forward-looking: it considers the future good we can do to society including the criminal." (Punishment and the Elimination of Responsibility, at 159.)

Under the circumstances of this case, it is possible that not one of the four reasons mentioned as justifying punishment would be furthered if the defendant were sent to prison. The legislature's apparent act of individualization of punishment in the context of the offender who is convicted following a trial under section 104—22 (Ill. Rev. Stat. 1989, ch. 38, pars. 104—22, 104—26(c)(1)) would be thwarted were we to ignore the discretion given to the sentencing authority by section 104—26.

Additionally, under the current statutory scheme a "least restrictive alternative" approach to sentencing exists as part of Public Act No. 80—1099, Illinois' determinate sentencing law. (Schuwerk, *Illinois' Experience With Determinate Sentencing: A Critical Reappraisal Part 2: Efforts to Impose Substantive Limitations on the Exercise of Judicial Sentencing Discretion*, 34 DePaul L. Rev. 241, 244 nn.1, 3 (1985), citing "An Act in relation to the Criminal Justice System in Illinois" (Pub. Act No. 80—1099, eff. Dec. 28, 1977 (1977 Ill. Laws 3264-3318)).) (Pub. Act No. 80—1099, eff. Dec. 28, 1977 (1977 Ill. Laws 3264-3318)).) The determinate sentencing law has been described as "structuring rather than limiting the exercise of discretion." (34 DePaul L. Rev. at 247.) Section 5—6—1(a) of the Unified Code of Corrections (Ill. Rev. Stat. 1983, ch. 38, par. 1005—6—1(a)), codified by Public Act No. 80—1099 (Pub. Act No. 80—1099, §3, eff. February 1, 1978), adopted a "least restrictive alternative" approach to sentencing in which probation became the preferred disposition of all offenses for which it was authorized. This reversed prior law under which probation was to be denied unless certain conditions were satisfied. See Ill. Rev. Stat. 1977, ch. 38, par. 1005—6—1(a).

Section 5—6—1(a) of the Unified Code of Corrections currently provides:

"(a) Except where specifically prohibited by other provisions of this Code, the court shall impose a sentence of probation or conditional discharge upon an offender unless, having regard to

the nature and circumstance of the offense, and to the history, character and condition of the offender, the court is of the opinion that:

(1) his imprisonment or periodic imprisonment is necessary for the protection of the public; or

(2) probation or conditional discharge would deprecate the seriousness of the offender's conduct and would be inconsistent with the ends of justice." (Ill. Rev. Stat. 1989, ch. 38, par. 1005—6—1(a).)

Notwithstanding minor amendments since its codification in 1977, this version of the statute maintains the "least restrictive alternative" approach in that probation is deemed to be the presumptively appropriate sentence when available.

"This elevation of probation to a preferred disposition for all probationable offenses reversed prior Illinois law in that regard, but its significance extends far beyond that fact. When that reversal is read in conjunction with the Act's preference for shorter regular terms sentences and its failure to mandate either extended term or consecutive sentences for any offenders other than three-time class X felons, the conclusion is inescapable that in adopting the Act the General Assembly embraced the principles of 'least restrictive alternative' sentencing.

\* \* \*

\*\*\* This clear legislative preference for shorter rather than longer sentences when probation was inappropriate is consistent with the principle of 'least restrictive alternative' sentencing. When considered in conjunction with the preeminent position given to probation in the Act's overall sentencing scheme, this provision manifests a legislative intent that sentencing judges move upwards from the least restrictive (nonincarcerative) sanctions available to more and more restrictive penalties, and select the least restrictive alternative commensurate with the circumstances at hand." (34 DePaul L. Rev. at 253-54.)

The "least restrictive alternative" approach and its apparent underpinnings in the statutory framework support our conclusion that the trial court erred in ruling that it had no discretion in sentencing the defendant to probation under section 104—26.

Finally, while not necessarily authoritative, we find our decision in this case to be consistent with the guidelines set forth by the Illinois Planning Council on Developmental Disabilities. (See Ill. Rev. Stat. 1989, ch. 91½, par. 100—48.1 *et seq.*)

"In setting forth the assertion that individuals with developmental disabilities are accountable for offenses which they commit, *the Illinois Planning Council on Developmental Disabilities also strongly advocates for the courts to consider the disability in setting appropriate sentences for those individuals convicted.* \*\*\* The Illinois Planning Council on Developmental Disabilities also supports the equal availability of the least restrictive sentencing option consistent with public safety, combined with a coordinated habilitative program. *The Illinois Planning Council on Developmental Disabilities recognizes that there are offenders with a developmental disability who should be incarcerated for the safety of the community and themselves.* \*\*\* The development of programs should be promoted which provide more appropriate sentencing options for the courts when dealing with offenders with disabilities. *An increase in the capacity of existing sanctions (or penalties) should be promoted to appropriately respond to the offender with developmental disabilities.*" (Emphasis added.) Policy Statements of the Illinois Planning Council on Developmental Disabilities, 2—3 (June 1991).

In conclusion, we vacate the sentence imposed upon Bryan Watters and remand this cause for a new sentencing hearing consistent with this opinion. By our reversal we do not mean to mandate the type of sentence the trial court should impose. We do, however, wish to make it clear that the court has the discretion to choose the alternative disposition of probation in this case even though the defendant has been convicted of a Class X felony. As the conviction is not being challenged on appeal, the conviction is affirmed.

Affirmed in part; vacated in part and remanded.

H. LEWIS and RARICK, JJ., concur.