THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DAVID CUNDIFF, Defendant-Appellant.

Fifth District    No. 5—99—0534

Opinion filed June 7, 2001.

Sharee S. Langenstein, of Capps & Associates, of Carbondale, for appellant.

Charles Garnati, State's Attorney, of Marion (Norbert J. Goetten, Stephen E. Norris, and Kevin D. Sweeney, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE HOPKINS delivered the opinion of the court:
A jury found David Cundiff (defendant) guilty but mentally ill of

the offense of attempted first-degree murder of a peace officer (720 ILCS 5/8—4(a), 9—1(a), (b)(1) (West 1998)). The jury also found defendant guilty but mentally ill of attempted first-degree murder and of armed violence; however, the trial court vacated these convictions. The trial court sentenced defendant to 30 years' incarceration on his conviction for attempted first-degree murder of a peace officer. Defendant appeals, contending that the State failed to prove he was guilty beyond a reasonable doubt; that he was denied the effective assistance of counsel, as trial counsel failed to assert other affirmative defenses consistent with his defense of not guilty by reason of insanity; that evidence presented by the State was prejudicial and inflammatory, thereby denying him a fair trial; that the trial court erred in not sentencing him pursuant to the provisions of section 104—26 of the Code of Criminal Procedure of 1963 (725 ILCS 5/104—26 (West 1998)); and that he is entitled to a new sentencing hearing, as the amended statute (720 ILCS 5/8—4(c) (West 1998)) under which he was sentenced was declared unconstitutional. We affirm.

## I. BACKGROUND

Defendant stabbed Scott Houston, the police chief of Crainville, with a knife on March 16, 1998. On April 1, 1998, after a hearing, defendant was found unfit to stand trial. On September 3, 1998, defendant was restored to fitness and found fit to stand trial. A trial began and four jurors had been selected when defendant was again determined to be unfit to stand trial. On March 1, 1999, following another fitness hearing, defendant was found fit to stand trial. Defendant was tried in April 1999 and found guilty of attempted first-degree murder of a peace officer.

## II. FACTS

The facts of the crime, as adduced at the trial, are as follows. Defendant, who was 58 years old at the time of the incident, suffers from a mental illness—schizophrenia, paranoid type. Defendant has been in and out of mental institutions since 1971. For several years prior to March 16, 1998, defendant had not taken his medication for his mental illness.

Defendant lived in a mobile home on the property of his mother, Geraldine Smith. On March 16, 1998, when construction workers came to Smith's home to work, defendant threatened the construction workers. Both defendant and the construction workers contacted the authorities. As a result, Houston went to Smith's home to investigate.

Houston arrived at Smith's residence about 1:45 that afternoon. Defendant was standing outside waving a lighted flashlight. Houston told defendant why he was there. Defendant told Houston to get off

his property or he would kill Houston. When Houston asked defendant how he would do that, defendant pulled out a pocket knife and opened the blade.

Houston went into Smith's home and talked to her. Smith told Houston that defendant needed treatment for his mental illness. Houston called the Williamson County sheriff's department, and the sheriff's office advised Houston to arrest defendant and to bring him in for a mental evaluation.

Houston went outside and slowly approached defendant, trying to calm defendant down. Defendant still had the flashlight and the open knife in his hands. Houston asked defendant to put down the flashlight and knife and to come into the house so that they could talk with his mother, but defendant did not do so. When Houston got within four feet of defendant, defendant lunged at him, swinging the flashlight at Houston's head. Houston grabbed defendant and wrestled him to the ground. While Houston tried to secure defendant, defendant stabbed Houston in the inner thigh of his left leg. Defendant twisted the knife in Houston's leg. Houston took defendant's hand, with the knife still in it, and pulled it from his leg. Defendant pulled his hand loose from Houston and slashed Houston's chest, slicing Houston's shirt and ballistic vest.

Houston got the knife from defendant, placed the knife in his pocket, and handcuffed defendant. Houston used his pack radio to call for assistance and an ambulance for himself.

Two Carterville police officers arrived, followed by the ambulance. The ambulance took Houston to Carbondale Memorial Hospital, where Houston underwent surgery to his leg. At the trial, Houston identified his bloody pants, slashed shirt, and ballistic vest.

Orien Drew, an officer for the Carterville police department, testified that he went to Smith's home in response to Houston's call for assistance. Houston told Drew that defendant had stabbed him, and Houston gave Drew the knife. According to Drew, defendant said, "I didn't cut him that fucking bad."

Drew took defendant to the Williamson County jail in his squad car. Several officers removed defendant from the squad car at the jail, as defendant refused to cooperate. Drew, along with Officer Eric Frattini, then went to Carbondale Memorial Hospital. When Drew and Frattini returned to the jail, Drew spoke to defendant. Defendant told Drew that he called the Carterville police, and he asked Drew why the Carterville police had not come to his residence.

Frattini, an investigator for the Williamson County sheriff's department, testified that he met Drew's squad car at the jail. Frattini described defendant as uncooperative and belligerent. Frattini cor-

roborated that he and Drew went to the hospital and retrieved Houston's clothing. Frattini identified Houston's pants, shirt, and ballistic vest as the clothing he retrieved on March 16, 1998.

At this time, the assistant State's Attorney stated as follows: "[I]n light of the fact that Scott Houston has testified that there's some blood on [his clothes], I would like the jury to be able to see them better. Since they didn't see them, I'd like to be able to hold them up for them to see them without them having to touch them so there's no risk of any kind of health threat." Defense counsel stated he had no objection to the prosecutor's proposed actions.

Dr. David Clutts testified that he surgically repaired Houston's wound on March 16, 1998. Dr. Clutts explained that Houston's wound was potentially life-threatening, as the wound was about a quarter of an inch from the femoral artery, a major artery in the leg. Dr. Clutts also stated that a person normally has 10 units of blood but that Houston had lost three to four units of blood.

Dr. Robert Marsh, a clinical psychologist, testified that he knows the standard for legal insanity. Dr. Marsh examined defendant in September 1998 to determine if defendant was legally insane at the time of the incident. Dr. Marsh reviewed police reports, interviewed defendant's mother and uncle and Houston, and reviewed defendant's treatment records from the Marion Veteran's Administration Hospital (VA Hospital) and Chester Mental Health Center (Chester). Dr. Marsh tried to interview defendant on three occasions; however, defendant refused to talk to him on the third occasion.

Dr. Marsh stated that defendant's treatment records establish that defendant suffers from schizophrenia to varying degrees, depending on defendant's medication compliance, and that defendant's symptoms include paranoia. Dr. Marsh tried to determine which symptoms of schizophrenia defendant was suffering from on March 16, 1998, by considering others' observations of defendant at the time and by structuring the questions he asked defendant so that they might reflect defendant's symptoms.

Dr. Marsh concluded from his examination that defendant's mental illness was minor to moderate at the time of the incident. Dr. Marsh based his opinion on defendant's statement to Dr. Marsh that he was afraid that the construction workers would overcharge his mother when defendant could perhaps do the work for less money. Defendant did not express a physical fear of the construction workers. Also, defendant indicated that when Houston arrived, defendant knew that Houston was a police officer and that Houston was not going to hurt him. Dr. Marsh found that defendant's memory was clear on events that occurred before Houston arrived at Smith's home and after he

was transported in the police car but that his memory was less clear for the time between the two events. Defendant described the incident with Houston as "a little ruckus."

Dr. Marsh told defendant that he had been asked to determine whether defendant's mental illness had anything to do with the incident. According to Dr. Marsh, defendant replied: "You know it did. *** I thought sure that mental illness would have caused what I did." When Dr. Marsh told defendant that he was not sure that defendant's mental illness had caused the incident, defendant told Dr. Marsh that he did not think Dr. Marsh knew what mental illness was. According to Dr. Marsh, defendant also said, "What do I need *** to tell you to show you that [the mental illness] did[?]"

Because defendant indicated to Dr. Marsh that defendant believed that Houston came to help him, Dr. Marsh did not think that defendant incorporated Houston into any delusional thinking. Dr. Marsh explained that the fact that defendant suffers from paranoid schizophrenia alone does not equate to insanity. It was Dr. Marsh's opinion that defendant was sane at the time of the incident with Officer Houston.

On cross-examination, Dr. Marsh admitted that defendant had been taking psychotropic medication for his mental illness for several months before Dr. Marsh interviewed defendant and that the medication would improve defendant's thought disorder; however, Dr. Marsh stated that he took this fact into account in forming his opinion. Defendant told Dr. Marsh that his symptoms on March 16, 1998, were that he was experiencing "some degree of a blue light in one eye" and that he could remember hearing some voices talking to him. Defendant communicated no other delusional thinking to Dr. Marsh.

Smith testified that she is defendant's mother. Smith explained that defendant has lived a terrified existence for the few years before the trial and that he used a flashlight to scare "whatever off." Smith stated that defendant had been in that condition for the previous two or three years because he had not been on medication. Smith said that although defendant is better when he takes medication, defendant does not like taking the medication.

Dr. David Warshauer, a clinical psychologist, testified that he examined defendant on March 25, 1998. Dr. Warshauer stated that he understood the standard for legal insanity and that he examined defendant to determine whether he was legally insane at the time of the incident. Defendant had not been taking his medication prior to the interview. Dr. Warshauer's examination included a psychosocial history; a review of defendant's records from the VA Hospital, Chester, and Choate Mental Health Center (Choate); a review of the incident

reports of March 16, 1998; and an interview with defendant. Dr. Warshauer testified that defendant's interview did not go well, as defendant was very guarded and very evasive, which Dr. Warshauer stated is typical of individuals suffering from mental illness. Defendant would not answer many of Dr. Warshauer's questions.

Dr. Warshauer stated that defendant had nine admissions to Choate from 1971 to "1980 something." Defendant was diagnosed as paranoid schizophrenic. The same diagnosis of defendant was made at the VA Hospital and also at Chester in August 1998.

Dr. Warshauer explained that symptoms of paranoid schizophrenia are delusions and hallucinations. The symptoms can also include what Dr. Warshauer identified as "Capgras Syndrome," which the doctor explained is a belief that a person is being impersonated by someone else. Dr. Warshauer stated that defendant was not sure that the judge was really the judge. Dr. Warshauer also explained that schizophrenics become very frightened because of their delusional system, that they think other people are trying to hurt or kill them, and that because of the delusion, they become dangerous. Dr. Warshauer thought defendant "may have" incorporated Houston into his delusions.

Dr. Warshauer testified that the flashlight defendant was waving was one of his delusions, because defendant believed that the flashlight made him more invulnerable to the light rays that defendant thought were affecting him. Dr. Warshauer found defendant's behavior in March 1998 consistent with defendant's behavior during previous hospitalizations in Choate, where Dr. Warshauer was the chief psychologist. It was Dr. Warshauer's opinion that defendant was legally insane on March 16, 1998.

Dr. Warshauer agreed with Dr. Marsh that the fact that defendant is a paranoid schizophrenic does not automatically mean that defendant was insane on March 16, 1998. However, Dr. Warshauer believed that if defendant was in an acute stage of his illness, which Dr. Warshauer thought he was, then that alone would be sufficient to find defendant legally insane. The basis of Dr. Warshauer's opinion was that defendant was not taking medication, was evasive, would not make eye contact, would not answer questions, was fairly withdrawn and reclusive, referred to delusions, and was not sure that the judge was the judge.

Dr. Warshauer admitted that defendant selected which questions he would answer. As an example, Dr. Warshauer stated that he asked defendant whether he had been married and that defendant, who had been married, told Dr. Warshauer he had not. Dr. Warshauer could not say whether defendant did not remember his marriage or whether he was distorting the truth. Dr. Warshauer found that defendant's mem-

ory was good when he talked about his childhood, his father, his educational background, and other areas of his life. Dr. Warshauer believed that defendant's delusions were severe enough on March 16, 1998, so that if defendant believed that his life was being threatened, defendant might resort to killing someone if he thought he had to protect his life.

The jury found defendant guilty but mentally ill of attempted first-degree murder of a peace officer. The court sentenced defendant to 30 years' incarceration. Defendant appeals.

## III. ANALYSIS

### A. Legal Insanity Defense

Defendant contends that the State failed to prove his sanity at the time of the incident beyond a reasonable doubt and that the jury's finding that defendant was guilty but mentally ill was against the manifest weight of the evidence. We disagree.

■ All defendants are presumed to be sane. *People v. Hill*, 297 Ill. App. 3d 500 (1998). Insanity is an affirmative defense, and once it is raised, the defendant bears the burden of proving by a preponderance of the evidence that he was legally insane at the time of the offense. *People v. Fierer*, 260 Ill. App. 3d 136 (1994). The State is only required to prove the elements of the offense beyond a reasonable doubt, not that the defendant is sane beyond a reasonable doubt. 720 ILCS 5/6—2(e) (West 1998). A defendant may suffer from mental illness and still not be found to be legally insane. *Fierer*, 260 Ill. App. 3d at 143. Whether a defendant is legally insane is a question of fact, and the fact finder's determination will not be reversed unless it is contrary to the manifest weight of the evidence. *People v. Sojak*, 273 Ill. App. 3d 579 (1995). The trier of fact is free to accept one expert's testimony over another's, and the jury decides what weight to accord the experts' respective testimony. *Hill*, 297 Ill. App. 3d at 517. The weight given to an expert's opinion is measured by the stated reasons and the factual details supporting the conclusion. *Hill*, 297 Ill. App. 3d at 518. Additionally, lay witnesses' observations of a defendant's sanity are relevant if they are made shortly before or after the crime's occurrence. *Sojak*, 273 Ill. App. 3d at 587.

■ Here, the jury accepted Dr. Marsh's opinion concerning defendant's sanity. The reasons and factual details for the doctor's opinions support the jury's decision. Dr. Marsh attempted to determine what defendant's delusions were at the time of the offense and concluded that, based on defendant's statements and the observations of others at the time of the offense, defendant was delusional but his delusions did not incorporate Officer Houston. The only delusion de-

fendant relayed to Dr. Marsh concerned a "blue light" in his eye and hearing voices. No evidence was produced to explain what the voices said or if the voices were the reason defendant stabbed Officer Houston. Further, the jury may have determined that defendant knew what he was doing, given defendant's statements to Dr. Marsh that his mental illness caused him to do what he did.

In contrast, the basis of Dr. Warshauer's opinion was that defendant's behavior was consistent with his behavior on past hospitalizations and that defendant was not taking medication, was evasive, would not make eye contact, would not answer questions, was withdrawn and reclusive, was having delusions, and was not sure the judge was the judge. None of these facts established that defendant lacked substantial capacity to appreciate the criminality of his conduct or that he was unable to conform his conduct to the requirements of the law.

Both Dr. Marsh and Dr. Warshauer agreed that mental illness alone was not equal to legal insanity. Further, both doctors found that defendant's memory was unclear only about the events involving Officer Houston. Dr. Warshauer testified that defendant selected the questions he wanted to answer and that because of some of defendant's answers, Dr. Warshauer could not determine if defendant was unable to remember or if he was distorting the truth.

In addition, lay witnesses' testimony bolsters the jury's determination that defendant was sane at the time of the offense. Defendant's statement to Officer Drew that he did not cut Houston very badly establishes that defendant was aware of what he was doing. Overall, defendant failed to prove by a preponderance of the evidence that he was legally insane at the time of the crime, and the jury's finding that defendant was sane is not against the manifest weight of the evidence.

## B. Ineffective Assistance of Counsel

■ Defendant claims that his trial counsel was ineffective because he failed to assert other viable affirmative defenses relating to his mental state. Defendant argues that his counsel was ineffective as he failed to assert the affirmative defense that defendant lacked the specific intent to kill because of "diminished capacity"; because he did not argue that defendant's actions were not done "knowingly," as that term is used in the armed violence statute; and because he did not raise the affirmative defense of self-defense.

The standard of review for a claim of ineffective assistance of counsel is well-established. See *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984) (adopted in Illinois in *People v. Albanese*, 104 Ill. 2d 504 (1984)). The standard of review is

two-pronged: a defendant must show (1) that his counsel's representation fell below an objective standard of reasonableness and that counsel's shortcomings were so serious as to deprive defendant of a fair trial, a trial whose result is reliable and (2) that his counsel's unprofessional errors were so serious that there is a reasonable probability that, but for the unprofessional errors, the outcome of the proceeding would have been different. *Albanese*, 104 Ill. 2d at 525. The court indulges in the strong presumption that an attorney's conduct falls within the wide range of reasonable professional conduct, and a defendant must overcome the presumption that counsel's actions can be considered sound trial strategy. *Albanese*, 104 Ill. 2d at 526, citing *Strickland*, 466 U.S. at 689-90, 80 L. Ed. 2d at 694-95, 104 S. Ct. at 2065-66. An attorney's choice of trial strategy is a matter of professional judgment to which a review of counsel's competency does not extend. *People v. Cordevant*, 297 Ill. App. 3d 193 (1998). "Trial strategy includes an attorney's choice of one theory of defense over another." *People v. Campbell*, 264 Ill. App. 3d 712, 732 (1992).

Here, defense counsel set forth the affirmative defense of insanity. The defense of insanity appears to have been the best defense for defendant. Simply because a trial strategy is unsuccessful is not evidence that counsel was ineffective. *People v. Madej*, 177 Ill. 2d 116 (1997), *overruled on other grounds by People v. Coleman*, 183 Ill. 2d 366 (1998). Defendant has not proved that his trial counsel was ineffective, because counsel's choice of insanity as an affirmative defense constituted sound trial strategy.

## C. Evidence of Bloody Uniform

■ Defendant's third argument is that the trial court abused its discretion when it admitted Officer Houston's bloody uniform into evidence. Defendant claims that the error was compounded by the prosecutor's holding up the uniform to show the jury. Defense counsel did not object to the admission of the evidence or to the prosecutor's actions at the trial or in his posttrial motion. The failure to object at the trial and in a posttrial motion waives the issue for consideration on appeal. See *People v. Enoch*, 122 Ill. 2d 176 (1988). Further, the admission of Officer Houston's uniform into evidence was a matter of discretion left to the trial court. See *People v. Stewart*, 122 Ill. App. 3d 546 (1984). The evidence was relevant to show defendant's intent to kill the officer, an element of the offense of attempted first-degree murder. *People v. Williams*, 165 Ill. 2d 51 (1995). Because the evidence of the bloody and slashed uniform was relevant, the plain error doctrine does not apply. Defendant has waived this issue.

Defendant alternatively argues that his counsel was ineffective for

failing to object to the admission of the evidence and to the showing of the uniform to the jury. Defendant's argument consists of one sentence. Here, the admission of the evidence and the showing of the evidence to the jury were relevant to an element of the offense, so counsel's failure to object to relevant evidence was objectively reasonable professional judgment and was not a serious unprofessional error. Defendant's counsel was not ineffective under the standard set forth in *Strickland*. See *Strickland*, 466 U.S. at 690, 80 L. Ed. 2d at 695, 104 S. Ct. at 2066.

### D. Section 104—22

■ Defendant next contends that the trial court erred in determining that defendant had not been tried pursuant to section 104—22 of the Code of Criminal Procedure of 1963 (725 ILCS 5/104—22 (West 1998)), which provides as follows:

"Trial with special provisions and assistance. (a) On motion of the defendant [or] the State or on the court's own motion, the court shall determine whether special provisions or assistance will render the defendant fit to stand trial as defined in Section 104—10.

(b) Such special provisions or assistance may include but are not limited to:

(1) Appointment of qualified translators who shall simultaneously translate all testimony at trial into language understood by the defendant.

(2) Appointment of experts qualified to assist a defendant who because of a disability is unable to understand the proceedings or communicate with his or her attorney.

(c) The case may proceed to trial only if the court determines that such provisions or assistance compensate for a defendant's disabilities so as to render the defendant fit as defined in Section 104—10. In such cases the court shall state for the record the following:

(1) The qualifications and experience of the experts or other persons appointed to provide special assistance to the defendant;

(2) The court's reasons for selecting or appointing the particular experts or other persons to provide the special assistance to the defendant;

(3) How the appointment of the particular expert or other persons will serve the goal of rendering the defendant fit in view of the appointee's qualifications and experience, taken in conjunction with the particular disabilities of the defendant; and

(4) Any other factors considered by the court in appointing that individual." 725 ILCS 5/104—22 (West 1998).

As a result of the trial court's ruling, the court refused to sentence

defendant under section 104—26 of the Code of Criminal Procedure of 1963 (725 ILCS 5/104—26 (West 1998)), which allows a convicted defendant to be remanded to the Department of Human Services for a hearing and possible commitment to a mental institution rather than confinement in a prison. Defendant argues that the extra precautions taken by the trial court—daily inquiring and ensuring that defendant continued to take his psychotropic medications, which were needed to keep him fit to stand trial, before and during defendant's trial and sentencing hearing—were "special provisions" under section 104—22. Defendant asks this court to construe section 104—22 so as to include taking medication as a special provision and to remand this case so that defendant could be sentenced under section 104—26.

▪ The fundamental purpose of statutory construction is to give effect to the intent of the legislature. *People v. Watters*, 231 Ill. App. 3d 370 (1992). When a court construes a statute, the language of the statute is the best indication of the drafters' intent. *Watters*, 231 Ill. App. 3d at 380. In addition, a court should consider the reason for the law, the evils to be remedied, and the objects and purposes to be attained. *Watters*, 231 Ill. App. 3d at 382. Also, a court should consider the legislative history when construing a statute, as well as consider the statute in conjunction with other sections so that the statute's construction is consistent and harmonious with statutes that relate to the same subject. See *Watters*, 231 Ill. App. 3d at 382.

▪ Primarily, the language of this statute concerns the appointment of a person to help a disabled defendant during a trial. Clearly, the plain language of the statute establishes that section 104—22 applies to cases where more than medication is needed to make a defendant fit to stand trial.

Further, the language of the statute, coupled with the legislative history of the section, reinforces our construction of section 104—22. The legislative history of the statute was set out in *Watters*, 231 Ill. App. 3d at 382-83. In *Watters*, a case involving a mentally retarded defendant, this court noted that section 104—26 and, correspondingly, section 104—22 were drafted as a result of the case of Donald Lang, a visually impaired, illiterate deaf-mute who was twice indicted for murder. Donald Lang was unable to communicate by any means with anyone so as to assist in his defense. *Watters*, 231 Ill. App. 3d at 383. As this court stated in *Watters*, "The case of Donald Lang brought to the fore the dilemma of criminal defendants who are unfit to stand trial yet are *not in need of mental treatment*." (Emphasis added.) *Watters*, 231 Ill. App. 3d at 384. This court concluded that section 104—26 and section 104—22 were passed by the legislature in recognition of the problems of prosecuting and sentencing a developmentally

disabled and/or physically disabled defendant. *Watters*, 231 Ill. App. 3d at 383.

Lastly, when the entire legislation concerning unfit defendants is considered (725 ILCS 5/104—10 *et seq.* (West 1998)), our conclusion that section 104—22 does not apply to defendant's case is further supported. Section 104—21 pertains to defendants who are taking psychotropic medication. 725 ILCS 5/104—21 (West 1998). Since the legislators saw fit to separate defendants on medication from those needing special provisions and assistance, it is clear that section 104—22 does not apply to those defendants who only require medication to keep them fit for trial. The evidence in the case' *sub judice* established that defendant was taking psychotropic medication to render him fit to stand trial, so section 104—21 applies to defendant's case and sections 104—22 and 104—26 do not. The trial court did not err in ruling that section 104—22 did not apply to defendant's case, as the taking of medication alone is not a "special provision" under that section. Accordingly, sentencing defendant pursuant to section 104—26 was not an option for the trial court.

## E. Sentencing Hearing

■ Lastly, defendant contends that he is entitled to a new sentencing hearing because the amendment of section 8—4(c)(1) of the Criminal Code of 1961 (720 ILCS 5/8—4(c)(1) (West 1998)), under which defendant was sentenced, was found to be unconstitutional. Defendant argues that because the court sentenced defendant to the low end of the sentencing range under the amended statute, defendant's case must be remanded for resentencing in accordance with the valid sentencing limits.

Section 8—4(c) was amended by Public Act 88—680, effective January 1, 1995. Public Act 88—680 amended section 8—4(c)(1) by increasing the sentencing range for attempted first-degree murder from 15 to 60 years' imprisonment to 20 to 80 years' imprisonment whenever one of the aggravating factors specified in paragraphs (1), (2), and (12) of section 9—1(b) (720 ILCS 5/9—1(b)(1), (b)(2), (b)(12) (West 1994)) were present. Pub. Act 88—680, art. 35, § 35—5, eff. January 1, 1995 (1994 Ill. Laws 2782-83) (amending 720 ILCS 5/8—4(c)(1) (West 1994)). This was the statute in effect at the time of defendant's sentencing hearing in April 1999. However, in December 1999, the supreme court held Public Act 88—680 to be unconstitutional, as it was passed in violation of the single-subject rule. *People v. Cervantes*, 189 Ill. 2d 80 (1999). Because the statute was declared unconstitutional and was, therefore, void, defendant contends that his case should be remanded for a new sentencing hearing. We disagree.

When an amendment to a statute is held to be unconstitutional, the effect of the invalidation of the amendment is to leave the law in force as it was before the adoption of the amendment. *People v. Noble*, 308 Ill. App. 3d 980 (1999). Here, the sentencing statute that applied to defendant provided for a sentence to be imposed in the range of 15 to 60 years' imprisonment. See 720 ILCS 5/8—4(c)(1) (West 1998).

In *People v. Reedy*, 186 Ill. 2d 1 (1999), the truth-in-sentencing law was found to be unconstitutional because it, too, was passed in violation of the single-subject rule. In *Reedy*, in response to the State's argument that all sentences imposed under the invalid amendments were void and that remands for resentencing would be necessary, the supreme court discussed how sentences imposed under the invalid truth-in-sentencing amendments would be affected. The supreme court stated as follows:

"Indeed, there is no evidence in the record before us, and the State does not argue, that defendants did not receive sentences within statutory guidelines. Although the good-conduct credit scheme which may have been considered by the sentencing courts was invalid, the sentences imposed against defendants were, nevertheless, proper. Furthermore, it would be sheer speculation on our part to surmise the extent to which each sentencing court has ultimately factored in the truth-in-sentencing law's good-conduct credit scheme in imposing each sentence against every defendant before it. Consequently, we find no justification for disturbing any *statutorily sound sentence imposed* against any defendant under the void truth-in-sentencing law." (Emphasis added.) *Reedy*, 186 Ill. 2d at 16-17.

The reasoning set forth in *Reedy* applies here. At the sentencing hearing, the trial court found that there were no factors in mitigation in defendant's case. The court also found a factor in aggravation: defendant has a prior history of criminal activity. Based on this factor in aggravation and the fact that Officer Houston's injury was life-threatening, the court sentenced defendant to 30 years' incarceration. This sentence was within the sentencing range of section 8—4(c)(1) before the amendment. Because defendant's sentence is proper under the correct statute, defendant is not entitled to a new sentencing hearing simply because the amended statute was held to be void.

## IV. CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Williamson County is affirmed.

Affirmed.

CHAPMAN, P.J., and GOLDENHERSH, J., concur.