# Illinois Official Reports

## Appellate Court

---

### *People v. Nieto-Roman*, 2019 IL App (4th) 180807

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOSE MIGUEL NIETO-ROMAN, Defendant-Appellant. |
| District & No. | Fourth District<br>No. 4-18-0807 |
| Filed | November 26, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Cass County, No. 14-CF-112; the Hon. Bob Hardwick Jr., Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Stephen L. Richards, of Chicago, for appellant.<br><br>R. John Alvarez, State's Attorney, of Virginia (Patrick Delfino, David J. Robinson, and David E. Mannchen, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE TURNER delivered the judgment of the court, with opinion.<br>Justices Knecht and Cavanagh concurred in the judgment and opinion. |

¶ 1 In November 2014, the State charged defendant, Jose Miguel Nieto-Roman, by information with two counts of first degree murder (720 ILCS 5/9-1(a)(1), (2) (West 2014)) and one count of aggravated battery (720 ILCS 5/12-3.05(b)(1) (West 2014)). In May 2015, the State also charged defendant with felony murder (720 ILCS 5/9-1(a)(1), (2) (West 2014)) predicated upon predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2014)). At a June 2015 hearing, defendant entered a plea of guilty to one count of first degree murder (720 ILCS 5/9-1(a)(1) (West 2014)) pursuant to a negotiated plea agreement. Under the plea agreement, the State moved to dismiss the other three charges and defendant's sentence would be capped at 50 years in prison. The Cass County circuit court accepted the agreement and factual basis and entered a judgment of guilty. In August 2015, the court held defendant's sentencing hearing and sentenced him to 50 years in prison. Defendant filed *pro se* a timely motion to withdraw his guilty plea. Defendant's various attorneys filed several other postplea motions, including an amended motion to withdraw defendant's guilty plea and an amended motion to reconsider defendant's sentence in June 2017. After a November 2018 evidentiary hearing, the court denied defendant's amended motion to withdraw his guilty plea and amended motion to reconsider his sentence.

¶ 2 Defendant appeals, asserting the circuit court erred by denying his amended motion to withdraw his guilty plea because he (1) presented a defense worthy of consideration, (2) showed a doubt of his guilt existed, and (3) was denied effective assistance of counsel based on defense counsel's failure to file a motion to suppress his custodial statements. We affirm.

¶ 3 I. BACKGROUND

¶ 4 All four of the charges in this case relate to the death of eight-month-old E.A.F. on October 31, 2014, who was the son of defendant's girlfriend, Ember A.F. At the June 26, 2015, hearing, the State presented the following plea agreement:

"Your Honor, in return for his guilty plea to Count 1, the state would be dismissing Counts 2, 3, and 4. We would agree to take the request that we had for natural life in prison, amend the information to take that out of there. We have agreed to a fifty year cap, so the sentencing range would be 20 to 50 years in [the Department of Corrections]. Of course, there would still be mandatory supervised release on whatever the court would decide on the sentence. We would have a full presentence investigation and we'd have a full sentencing hearing."

The circuit court then admonished defendant pursuant to Illinois Supreme Court Rule 402(a) (eff. July 1, 2012) and determined defendant's plea was voluntary.

¶ 5 After determining the plea was voluntary, the circuit court asked for the factual basis. The State provided, in pertinent part, the following factual basis:

"On October 31 of 2014 about approximately 8:00 A.M., Ember *** left her baby, [E.A.F.], with the defendant to care for him while she went to a Halloween party with her other child at the Beardstown school. She got to the school about 8:20. She spent her time at the party. She went back home a little bit after 10:00 A.M. The defendant was alone taking care of that baby. The only one to have contact with the baby for that two hour period of time. When Ember *** got back to the house, the baby was lifeless,

cool to the touch and was later pronounced dead at the Culbertson Hospital. Our evidence will show and our pathologist will testify to the fact that the baby died from blunt force trauma to the head, that was acute. In other words, it had just happened. Also, when Ember left the baby with the defendant, she changed the baby's diaper, the baby was awake, she fed the baby, it was healthy, there were no problems with the baby whatsoever. The doctor will also testify, the pathologist, the baby had approximately a five inch skull fracture with internal bleeding in the brain which was the ultimate cause of death. Also contributing to the death the doctor will testify that the baby had fractured ribs, burns, cocaine intoxication and cuts inside the baby's mouth and various other injuries. Our evidence will show that these were not accidental injuries. Our evidence will show that they were knowing, that the defendant knowingly caused the death of [E.A.F.] Also our evidence will show that the defendant, in fact, had cocaine in his system the same as the baby did."

The court asked defendant if that is what happened, and defendant replied in the affirmative. The court also asked defendant if he was taking any medication, and defendant noted he was taking a depression pill that contained a sleeping pill. Defendant had been taking the medication since he had been in jail. Defense counsel also asked defendant some questions about his representation of defendant. After the questions were over, the court confirmed defendant was pleading guilty to one count of first degree murder and entered judgment accordingly.

¶ 6    In August 2015, the circuit court held defendant's sentencing hearing. The State presented four photographs of the victim, and defendant presented the testimony of Tonya Bailey, the mother of one of defendant's children. Defendant also made a statement of allocution, which read as follows:

"Dear Judge, Kevin told me to write down what I wanted to say to you so I could read it and not forget anything. I don't know how to explain what happened that day. I loved [E.A.F.] very much and can't believe I would ever hurt him. He is gone now and I have to live with it. I have to live with that every day for the rest of my life. I know the pain will never go away. I guess it shouldn't. I won't blame drugs for what happened, but I wish I had never started with them because they can change you. You are not the same person and they did change me. I stabbed myself that day after everything because I no longer wanted to live knowing what I had done. I hope God will forgive me. I know you have to give me my sentence today, and it has to be for a long time. I hope you can give me the minimum of twenty. I will be almost fifty years old when I get out. I am done with drugs forever. I know you hear that all the time, but I mean it. I want to get an education while I'm in jail so I can do something productive when I get out. Nothing will ever make up for what I did. I want to try anyway. I'm so sorry. Thank you for letting me talk to you, Judge."

The court sentenced defendant to 50 years' imprisonment. On August 17, 2015, the court filed the written sentencing judgment.

¶ 7    On September 11, 2015, defendant filed *pro se* a motion to withdraw his guilty plea and vacate his sentence, asserting he did not receive effective assistance of counsel and his plea was involuntary. Three days later, defendant's plea counsel, Kevin Milner, filed a motion to vacate judgment and for leave to withdraw defendant's guilty plea and/or reconsideration of his sentence. In a letter filed on September 23, 2015, defendant asked the circuit court to reduce

his prison term to 20 years. In the letter, defendant stated he "will forever live with a guilt." In March 2016, defendant's second attorney, Timothy Wessel, filed a supplemental postplea motion on defendant's behalf. The supplemental motion raised numerous allegations of ineffective assistance of counsel. In June 2017, defendant's third attorney, Stephen Richards, filed an amended motion to withdraw defendant's guilty plea. The amended motion asserted the following: (1) defendant was innocent of the charge to which he pleaded guilty, (2) defendant was denied effective assistance of counsel because counsel failed to investigate or present evidence Ember murdered E.A.F., and (3) defendant was denied effective assistance of counsel because counsel failed to file a motion to suppress defendant's statements. Richards also filed an amended motion to reconsider defendant's sentence. Along with the two motions, Richards filed a certificate pursuant to Illinois Supreme Court Rule 604(d) (eff. Mar. 8, 2016).

¶ 8        In November 2018, the circuit court held an evidentiary hearing on defendant's amended motion to withdraw his guilty plea and amended motion to reconsider his sentence. Defendant testified on his own behalf and presented the testimony of Edgar Nieto-Roman, defendant's brother. The State presented the testimony of Illinois State Police Sergeant Scott Riley and Ember. The evidence relevant to the issues on appeal follows.

¶ 9        Edgar testified he had a telephone conversation with Ember on October 30, 2014. Ember called him that day, and the call lasted around 13 to 15 minutes. During the conversation, Ember told Edgar she had purchased Halloween costumes for her daughter and E.A.F. Ember stated she was taking both children to a Halloween party at her daughter's school the next day. Ember also mentioned defendant was cheating on her and he did not know what was coming to him. Edgar described Ember as mad due to defendant's cheating. Additionally, Edgar stated Ember called him on October 31, 2014, and only stated she had found E.A.F. under a blanket and the baby had burns. Edgar admitted he did not tell the police Ember called him after she found E.A.F. He also admitted defendant usually watched E.A.F. while Ember took her daughter to school.

¶ 10        Edgar also testified he attended a Romeo Santos concert with Ember on June 12, 2015. After the concert, they went to a Spanish club in Chicago called the Circuit. Ember was drinking alcohol that night. Ember told Edgar defendant was innocent. Ember stated she was bathing E.A.F. and dropped him. After she dropped E.A.F., Ember decided not to take him to the Halloween party. Edgar asked Ember why she had not said this before, and Ember stated because she did not want to go to jail.

¶ 11        Defendant testified he was innocent of the charges against him. As to the letter he wrote after he pleaded guilty, defendant explained he was referring to the guilt he had for failing to protect E.A.F. from Ember. He also testified his attorney, Kevin Milner, wrote the statement of allocution defendant made at his sentencing hearing. Defendant further testified he made false statements to the police implicating himself because Ember threatened to kill herself and defendant's unborn child.

¶ 12        Moreover, defendant testified about the night of October 30, 2014. According to defendant, Ember and her children were with him when he closed his family's grocery store that night around 10 p.m. After he closed the store, the four of them went to Wal-Mart to purchase costumes for the children and candy for the school Halloween party. Ember told defendant she was taking both children to the Halloween party. Defendant gave Ember money to purchase items but did not go in the store. Ember purchased about $200 worth of candy and costumes. After leaving Wal-Mart, they stopped at a liquor store and the home of a drug dealer. Defendant

purchased a half of a pound of cocaine for $5000. Thereafter, they went back to the grocery store, which had an apartment attached to it. Defendant admitted he snorted most of the cocaine but stated he did give some to Ember. On cross-examination, defendant testified he did not consume most of it but did consume a lot of it. He stayed up cleaning the store and watching television in the store. Defendant assumed Ember and the children had gone to sleep.

¶ 13       At about 2:45 a.m. on October 31, 2014, defendant went outside to smoke a cigarette. He offered a beer and a cigarette to a woman named Stacy who was walking down the street. The woman had already been drinking and accepted the beer and cigarette. He also gave her some cocaine. They ended up in his Cadillac Escalade, which was parked in the alley behind the store. Eventually, Ember came out and started hitting the door of the vehicle. Defendant drove off and parked the vehicle at a friend's house. There, he and Stacy finished the cocaine. Defendant returned to the store around 6:30 a.m. Ember awoke and started throwing things and hitting defendant. She broke defendant's cellular telephone and told him he would pay for his actions. Defendant fell asleep but did wake up to give Ember the car keys. Defendant got out of bed at 9:15 a.m., smoked a cigarette, and went back to bed.

¶ 14       Defendant woke up again when Ember began banging on the back door. He opened the door and went back to bed. At some point, Ember woke him up and stated "look what you made me do." Ember was holding E.A.F., who was wrapped in a colorful blanket. Defendant observed E.A.F. was not breathing, and defendant tried to give him cardiopulmonary resuscitation (CPR). Defendant attempted CPR for 10 minutes and then ordered Ember to get her daughter out of the vehicle. When Ember and the girl returned to the apartment, defendant told her to call an ambulance and began putting cream on the red markings on E.A.F.'s face. When Ember did not immediately call for the ambulance, he called her a "stupid b***," and Ember stated she did not want to call an ambulance because she did not want to go to jail. According to defendant, Ember still did not call an ambulance, so defendant hit her on the head with his cellular telephone. After being hit, Ember called the police. Defendant then realized he had cocaine in the bedroom. When he heard the sirens, he grabbed the cocaine and ran to a friend's home. The friend was not at home, so defendant put the cocaine in the trash.

¶ 15       When defendant returned to the store, he saw yellow tape was up and understood that to mean someone had died. Defendant went back to his friend's house and grabbed some knives. He then returned to the store because he wanted to die where E.A.F. died. When the police tased defendant, he stabbed himself. Defendant said he was hoping to die at the hands of the police.

¶ 16       The parties stipulated Milner would testify he represented defendant and spoke with both defendant and Edgar. Edgar never told Milner about Ember's confession she killed E.A.F. Milner would also testify defendant never told him of the names and occurrences he testified to at the hearing and contained in defendant's affidavits.

¶ 17       Riley testified he arrived in Beardstown to investigate the injuries sustained by E.A.F. between 12:30 p.m. and 1 p.m. on October 31, 2014. At that time, Riley did not know E.A.F. had died. When Riley arrived, defendant had not yet been taken into custody. When the police apprehended defendant, it was apparent defendant had stabbed himself in the stomach twice. Defendant had also been tased. Riley was in the ambulance with defendant when he was transported to the hospital. Master Sergeant Jamie Jackson was also in the ambulance and advised defendant of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), before questioning defendant. Defendant waived his rights, and the police recorded the interview of

defendant. Riley identified the recording of the conversation and the transcript of it, which were admitted into evidence. The ambulance ride to the hospital was 15 to 20 minutes long, and medical personnel were addressing defendant's condition during the ride. Defendant had an oxygen mask on while being transported to the hospital. During the interview, defendant did not say Ember was the person who killed E.A.F. Riley attempted to interview defendant at the hospital, but defendant asserted his right to counsel.

¶ 18     On November 16, 2014, Riley interviewed defendant at the Morgan County jail at defendant's request. Riley read defendant his *Miranda* rights, and defendant again waived them. Riley also identified a recording and transcript of that interview, which were admitted into evidence. During the November 2014 interview, defendant did not state Ember killed E.A.F. Defendant again stated he was giving E.A.F. a bath and the infant was in a blue carrier in the bathtub. While defendant was trying to get clothes, he heard a bang like the baby had hit his head. Defendant mentioned the baby had suffered burns.

¶ 19     Ember testified she was the mother of E.A.F., who was eight months old at the time of his death. Defendant was not the biological father of E.A.F. At the time of E.A.F.'s death, Ember had a five-year-old daughter who was in preschool, and she was five months pregnant with a child, whose father was defendant. Ember moved in with defendant in August 2014.

¶ 20     Ember explained her daughter's school started at 8:20 a.m. Her daily routine was she and her daughter left the house at 8 a.m., got breakfast at McDonald's, and then went to her daughter's school. While she was gone, Ember would leave E.A.F. at home in the care of defendant.

¶ 21     Ember testified she was the one who closed the store on October 30, 2014, because defendant's parents did not trust him with the money. Defendant was a cocaine user. She also testified she did not do drugs and did not consume cocaine on October 31, 2014. Ember never planned to take E.A.F. to the party because she could not hold E.A.F. and all of the candy bags and help out at the party. When she went to Wal-Mart, she bought her daughter's Halloween costume, candy, and bags to hold the candy. Ember denied having a telephone conversation with Edgar on October 30, 2014. She denied telling Edgar defendant was cheating on her and defendant had no idea what was coming to him.

¶ 22     Ember further testified she did not go out and see defendant in his Escalade in the early morning hours on October 31, 2014. Moreover, defendant never gave her cocaine that morning, and she did not know he purchased cocaine after they went to Wal-Mart. On the morning of October 31, 2014, she woke up around 7 a.m., and defendant was in bed with her. She knew defendant was in bed with her when she went to bed on October 30, 2014, and to her knowledge, he never left. Defendant also woke up at 7 a.m. When she got out of bed, she gave E.A.F. a bottle and changed his diaper. Ember then started getting her daughter ready for school. She did not put anything into E.A.F.'s anus on the morning of October 31, 2014, and never used a rectal thermometer. Before she left, Ember confirmed with defendant he was watching E.A.F. like he usually did. Ember and her daughter left around 8 a.m., went to McDonald's, and then went to the school. Ember attended the Halloween party and left the school around 10 a.m. She got home around 10:07 a.m. with her daughter. The back door was locked, so Ember knocked on the door. Her daughter was with her when defendant answered the door.

¶ 23     When defendant opened the door, he looked different, and Ember sensed something was wrong. She looked and saw E.A.F. had a blanket over the top of him. Defendant told her

daughter to go to the front. E.A.F. appeared burnt and motionless. He did not have any skin on his face. Ember was hysterical. She began yelling "what happened" at defendant. Defendant did not answer at first and was pacing back and forth. Defendant eventually stated E.A.F. fell in the bathtub. Ember had E.A.F. in her arms and tried to go towards the front door that separated the apartment from the grocery store, but defendant blocked her. She was eventually able to get past defendant and ran to the telephone in the store. Defendant ran after her and hit her upside the head with his cellular telephone. Ember then ran to defendant's cousin who was in the store and got a cellular telephone from him. She then called 9-1-1. Emergency responders arrived within five minutes. Ember did not call Edgar until she was at the hospital and did not call defendant's mother. Moreover, she denied telling defendant it was the last time he would ever cheat on her. Ember never begged defendant not to call the ambulance and never said it was her fault. She also denied saying not to call 9-1-1 because she did not want to go to jail. Ember also stated she and defendant never talked about what to say to the authorities and did not have an agreement as to what defendant would say.

¶ 24    Ember testified she was interviewed over the telephone by Riley and the conversation was recorded. She did not recall telling Riley she was 90% sure defendant stayed at home and did not go to Wal-Mart. Ember also did not recall telling Riley the costumes and candy were purchased earlier in the week. Additionally, Ember admitted she told Riley defendant's statement he paid $5000 for cocaine was a lie. However, Ember acknowledged she did not know whether defendant's statement about the cocaine was true or not. Ember also acknowledged she was under investigation by the Department of Children and Family Services (DCFS) for a bruise on E.A.F.'s leg. She continued to live with defendant despite the DCFS case and defendant's cocaine usage. Ember admitted visiting defendant in jail but denied writing any love letters to him. She also accepted defendant's telephone calls from jail.

¶ 25    Last, Ember testified she stayed in contact with defendant's family and was friends with Edgar. She admitted going to the concert and bar with Edgar but denied ever mentioning defendant that evening. According to Ember, Edgar saw another friend at the bar, and she did not talk to him much after that.

¶ 26    In rebuttal, Edgar testified Ember would write love letters to defendant before he would go visit his brother in jail. During the visit, Edgar would put the letters up to the glass for defendant to read. One of the letters Ember denied writing was on a Styrofoam plate. Edgar testified the plate was one used to wrap up meat in the grocery store. He observed Ember write the note on the Styrofoam plate. He also provided the paper and pen for the other letter. The circuit court admitted the letters over the State's objection. Edgar testified he kept all of the letters Ember wrote to defendant. The State recalled Ember, who again denied writing the letters.

¶ 27    On November 28, 2018, the circuit court entered a written order denying defendant's amended motion to withdraw his guilty plea and amended motion to reconsider. As to a potential motion to suppress, the court found the statements were made voluntarily. The court also found defendant admitted his guilt at the sentencing hearing and subsequent *pro se* filings. The court found defendant only wanted to withdraw his plea because he was unhappy with his 50-year prison term.

¶ 28    On December 12, 2018, defendant filed a timely notice of appeal in compliance with Illinois Supreme Court Rule 606 (eff. July 1, 2017). Accordingly, this court has jurisdiction under Illinois Supreme Court Rule 604(d) (eff. July 1, 2017).

¶ 29                                     II. ANALYSIS

¶ 30       Defendant contends the circuit court erred by denying his motion to withdraw his guilty plea because he had a defense worthy of consideration, he had raised a doubt of his guilt and the ends of justice would be better served by a trial in this case, and he was denied effective assistance of counsel. The State disagrees.

¶ 31       Generally, the decision to grant or deny a defendant's motion to withdraw a guilty plea rests in the circuit court's sound discretion and, thus, is reviewed for an abuse of discretion. *People v. Hughes*, 2012 IL 112817, ¶ 32, 983 N.E.2d 439. A reviewing court will only find an abuse of discretion where the ruling is arbitrary, fanciful, unreasonable, or no reasonable person would take the view adopted by the circuit court. *People v. Delvillar*, 235 Ill. 2d 507, 519, 922 N.E.2d 330, 338 (2009). A defendant does not have an automatic right to withdraw his or her guilty plea. *Hughes*, 2012 IL 112817, ¶ 32. Rather, the defendant must show a manifest injustice under the facts involved. *Hughes*, 2012 IL 112817, ¶ 32. "Withdrawal is appropriate where the plea was entered through a misapprehension of the facts or of the law or where there is doubt as to the guilt of the accused and justice would be better served through a trial." *Hughes*, 2012 IL 112817, ¶ 32 (citing *People v. Baez*, 241 Ill. 2d 44, 110, 946 N.E.2d 359, 398 (2011)).

¶ 32                            A. Defense Worthy of Consideration

¶ 33       Defendant contends another basis for allowing the withdrawal of a guilty plea is if the defendant has a defense to the charge worthy of consideration. The State disagrees a worthy defense standing alone is a basis for allowing a defendant to withdraw his guilty plea. In 1952, the Illinois Supreme Court did include "a defense worthy of consideration by a jury" as one of the reasons for allowing a defendant to withdraw a guilty plea. *People v. Morreale*, 412 Ill. 528, 531-32, 107 N.E.2d 721, 723 (1952). Specifically, the *Morreale* court stated the following:

           "Where it appears that the plea of guilty was entered on a misapprehension of the facts or of the law, or in consequence of misrepresentations by counsel or the State's Attorney or someone else in authority, or the case is one where there is doubt of the guilt of the accused, or where the accused has a defense worthy of consideration by a jury, or where the ends of justice will be better served by submitting the case to a jury, the court should permit the withdrawal of the plea of guilty and allow the accused to plead not guilty." *Morreale*, 412 Ill. at 531-32.

However, the supreme court has not used all of the aforementioned language since 1993. See *People v. Pugh*, 157 Ill. 2d 1, 14, 623 N.E.2d 255, 261 (1993). More recent supreme court cases like those previously cited and others do not include the defense worthy of consideration language. See *supra* ¶ 31; see also *Delvillar*, 235 Ill. 2d at 520; *People v. Pullen*, 192 Ill. 2d 36, 40, 733 N.E.2d 1235, 1237 (2000). We note the other cases cited by defendant in his brief and at oral arguments other than *Morreale* do not include "a defense worthy of consideration by a jury" language. See *People v. Jamison*, 197 Ill. 2d 135, 163, 756 N.E.2d 788, 803 (2001); *People v. Hillenbrand*, 121 Ill. 2d 537, 545, 521 N.E.2d 900, 903 (1988). In fact, the supreme court has dropped both the misrepresentation and defense bases and combined the doubt of guilt basis with the justice basis. Thus, we agree with the State the supreme court no longer recognizes the defense worthy of consideration language as a separate basis for allowing a defendant to withdraw his guilty plea. Even if such a basis did exist, defendant did not present

- 8 -

a defense worthy of consideration as explained in our analysis of whether defendant presented a doubt of his guilt.

¶ 34                                   B. Doubt of Defendant's Guilt

¶ 35      As to whether a doubt of defendant's guilt existed, defendant notes his testimony and Edgar's testimony at the evidentiary hearing about Ember's statements admitting she killed E.A.F. However, even assuming such testimony is admissible, Ember denied making the statements Edgar and defendant testified she made. A reviewing court affords great deference to the circuit court's assessment of the witnesses' credibility because " 'the circuit court is in a superior position to determine and weigh the credibility of the witnesses, observe the witnesses' demeanor, and resolve conflicts in their testimony.' " *People v. Parker*, 2016 IL App (1st) 141597, ¶ 29, 70 N.E.3d 734 (quoting *People v. Richardson*, 234 Ill. 2d 233, 251, 917 N.E.2d 501, 512-13 (2009)). Moreover, defendant's testimony is contrary to the statements he made to the police and to the court at his sentencing hearing and in his letter after the sentencing hearing. Defendant also did not tell Milner, his original attorney, Ember was the individual who killed E.A.F. Defendant pleaded guilty after Ember gave birth to his child in April 2015, and thus any continued threat of harm to his unborn child no longer existed, and he could have recanted his allegedly false statements instead of pleading guilty. Further, defendant did not present a reason for not telling his own attorney about exculpatory evidence of which he had personal knowledge. Additionally, the circumstantial evidence does not support defendant's claims in his amended motion to withdraw his guilty plea. The facts are undisputed both defendant and the infant had cocaine in their systems and defendant tried to kill himself after the infant had died.

¶ 36      Additionally, even if this court should not give deference to the circuit court's credibility determination, the evidence defendant presented at the evidentiary hearing was incredible and inconsistent with the other circumstantial evidence. Thus, we find it was insufficient to meet his burden of showing a doubt as to his guilt.

¶ 37      Accordingly, we find the circuit court did not abuse its discretion by finding defendant did not present a doubt as to his guilt.

¶ 38                                   C. Effective Assistance of Counsel

¶ 39      Last, defendant contends his counsel failed to provide effective assistance of counsel because counsel failed to file a motion to suppress defendant's custodial statements. The State first asserts we should decline to address this issue because the record has not been fully developed. However, defendant raised the claim in his amended motion to withdraw, and the circuit court held an evidentiary hearing on the amended motion. Thus, the parties had an opportunity to develop the necessary record to fully present the issue, and we will address the issue on appeal.

¶ 40      This court analyzes ineffective assistance of counsel claims under the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Evans*, 186 Ill. 2d 83, 93, 708 N.E.2d 1158, 1163 (1999). To obtain reversal under *Strickland*, a defendant must prove (1) his counsel's performance failed to meet an objective standard of competence and (2) counsel's deficient performance resulted in prejudice to the defendant. *Evans*, 186 Ill. 2d at 93. To satisfy the deficiency prong of *Strickland*, the defendant must demonstrate counsel made errors so serious and counsel's performance was so deficient that counsel was not functioning as

"counsel" guaranteed by the sixth amendment (U.S. Const., amend. VI). *Evans*, 186 Ill. 2d at 93. Further, the defendant must overcome the strong presumption the challenged action or inaction could have been the product of sound trial strategy. *Evans*, 186 Ill. 2d at 93. To satisfy the prejudice prong, the defendant must prove, but for counsel's unprofessional errors, a reasonable probability exists the proceeding's result would have been different. *Evans*, 186 Ill. 2d at 93. The *Strickland* Court noted a court should address a claim on the ground of lack of sufficient prejudice rather than counsel's constitutionally deficient representation when it is easier to do so. *Strickland*, 466 U.S. at 697.

¶ 41 When counsel has failed to file a motion to suppress, to establish the prejudice prong, the defendant must show a reasonable probability *both* (1) the circuit court would have granted the suppression motion *and* (2) the trial outcome would have been different if the evidence had been suppressed. *People v. Patterson*, 2014 IL 115102, ¶ 81, 25 N.E.3d 526; see also *People v. Brown*, 2018 IL App (4th) 160288, ¶ 46, 115 N.E.3d 408. Defendant contends a motion to suppress defendant's first custodial statement in the ambulance would have been granted. Assuming for argument's sake that is true, defendant does not establish a reasonable probability he would have been found not guilty after a trial. As previously noted, the facts are undisputed both he and the infant had cocaine in their systems and defendant tried to kill himself when he realized the infant had died. Furthermore, defendant does not develop any argument his November 2014 statements to Riley would have been suppressed. Thus, those statements, in which defendant claimed the baby fell in the bathtub while under his care, would also have been admissible as evidence of his guilt. Moreover, Ember testified she left E.A.F. in defendant's care that morning like she did every morning and the infant was burnt and motionless when she returned home. Here, defendant has failed to establish the prejudice prong of the *Strickland* test. Accordingly, the circuit court did not abuse its discretion by denying defendant's ineffective assistance of counsel claim.

¶ 42                                    III. CONCLUSION

¶ 43 For the reasons stated, we affirm the Cass County circuit court's judgment.

¶ 44 Affirmed.