NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2021 IL App (4th) 200197-U

NO. 4-20-0197

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
July 2, 2021
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Pike County |
| SIDNEY W. BALLENGER, | ) | No. 17CF1 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | John Frank McCartney, |
| | ) | Judge Presiding. |

_____

JUSTICE HARRIS delivered the judgment of the court.
Justices Cavanagh and Holder White concurred in the judgment.

**ORDER**

¶ 1     *Held*:   The trial court did not abuse its discretion by denying defendant's motion to withdraw his guilty plea or sentencing him to a term of imprisonment rather than probation.

¶ 2             Defendant, Sidney W. Ballenger, entered a partially negotiated guilty plea to one count of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2016)) and was sentenced to 18 years in prison. He filed a motion to withdraw his guilty plea, which the trial court denied. Defendant appeals, arguing the court abused its discretion by denying his motion to withdraw his plea because (1) it was not knowingly or voluntarily entered due to his severely limited mental capacity and misapprehension of law and fact and (2) he was "actually innocent" of the offense to which he pleaded guilty. Alternatively, defendant argues the court abused its discretion by sentencing him to a term of imprisonment rather than probation. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4            In November 2016, the police began investigating defendant after Ashley C., who was previously married to defendant's uncle, took her minor children, nine-year-old J.C. and six-year-old M.C., to the hospital, and reported that they had been sexually abused. During the investigation, Ashely's boyfriend, Tony Foster, whom she later married, reported receiving Facebook messages from defendant that contained admissions to the abuse. Defendant was ultimately interviewed by the police and arrested.

¶ 5            In January and February 2017, the State charged defendant with six Class X felony counts of predatory criminal sexual assault of a child. *Id.* The charges were based on allegations that, between May and September 2016, defendant, who was over the age of 17, engaged in various acts of sexual contact with J.C. and M.C. Specifically, the State alleged defendant (1) placed his penis on or in the anus of both minors (counts I and V), (2) placed his penis in the mouths of both minors (counts II and IV), (3) had J.C. rub his penis (count III), and (4) placed his penis on or in M.C.'s vagina (count VI).

¶ 6            In March 2017, the trial court ordered defendant to undergo a fitness evaluation with Dr. Terry M. Killian, a psychiatrist. In May 2017, Dr. Killian's forensic psychiatric evaluation report was filed with the court. The record shows Dr. Killian diagnosed defendant with probable anxiety disorder, possible depressive disorder, and intellectual development disorder, formerly "labeled as mental retardation." He noted defendant reported always having difficulty with social anxiety and excessive worrying, and school records indicated defendant was shy and had difficulty making eye contact. With regard to defendant's intellectual functioning, Dr. Killian stated defendant had "been diagnosed as having cognitive impairment throughout his school years" and

was always in special education classes. Intelligence quotient (IQ) testing "consistently placed [defendant] in the mild range of intellectual disability," *i.e.*, "what used to be called mild mental retardation." Defendant's school records identified his "full-scale IQ's over the years as 64, 63, 57, and 65." Additionally, defendant had an "overall adaptive behavior in the significantly delayed range."

¶ 7　　　　　However, Dr. Killian opined that with certain accommodations, defendant was fit to stand trial despite his intellectual impairment. He noted defendant was hesitant to discuss the allegations against him, in part due to embarrassment, but that he "demonstrated an adequate understanding of the nature and purpose of the proceedings against him." According to Dr. Killian, defendant reported that he was "charged with 'touching' " the victims in the case. Defendant was able to state that "he was accused of having the children 'suck [his] penis' and putting his penis 'in their butt[.]' " Defendant was also aware that the charges he faced were "serious" and stated he could be sentenced to somewhere between 6 and 60 years in prison.

¶ 8　　　　　Further, Dr. Killian noted defendant "was able to maintain his story of innocence despite [Dr. Killian] pushing him *** regarding the allegations." He found that consistent with information in police reports showing defendant requested an attorney almost immediately after the police started asking him questions about the sexual assault allegations. When questioned about the underlying facts of the case, defendant asserted his belief that Foster "threatened" J.C. and M.C. into making allegations against him because Foster did not like defendant. Regarding defendant's alleged admissions to the charged acts over Facebook, defendant acknowledged that the messages were sent from his Facebook account but asserted it was "not [his] writing." He maintained someone else sent the messages after he "left his Facebook page open on his telephone

and" went "to the store." Dr. Killian noted defendant did acknowledge sending a Facebook message about quitting his job, which was sent "at almost exactly the same time as the other" messages.

¶ 9        Regarding accommodations, Dr. Killian stated defendant would "need to have things explained to him slowly, clearly, and in simple terms." He stressed that clear and simple explanations were particularly needed for more abstract concepts because defendant did not "appear to be capable of very much abstract reasoning." Dr. Killian further stated as follows:

> "Persons who are intellectually impaired have a tendency to answer 'yes' when asked whether they understand something, whether they actually understand it or not, so it is very important that [defense counsel] and the court ensure that [defendant] actually does understand whatever concepts he needs to understand. It is definitely *NOT* sufficient to simply ask [defendant] if he understands something. He *MUST* be asked to explain the information back in his own words so that [defense counsel] and/or the court can see that [defendant] does actually understand what was said." (Emphases in original.)

¶ 10       Finally, Dr. Killian commented that although it was "clear" defendant understood that the behavior of which he was accused was wrong, it was also "almost certain" that his understanding was "fairly basic and concrete." He stated that due to defendant's intellectual impairment and limited ability to think abstractly, "his ability to grasp the social and moral reasons" regarding why the alleged behavior was wrong "would be significantly limited." Dr. Killian opined that the "*Watters* decision" (see *People v. Watters*, 231 Ill. App. 3d 370, 595 N.E.2d 1369 (1992))—which he stated addressed "whether the trial court *** was *required* to impose a

- 4 -

sentence of imprisonment" for a disabled offender subject mandatory imprisonment—"*could* apply to [defendant] because of his significantly impaired cognitive functioning." (Emphasis in original.) Again, he noted that defendant's "ability to understand right and wrong [was] limited and rather concrete because of his limited ability to think abstractly." Further, Dr. Killian stated that defendant's "mental retardation would make him very vulnerable to abuse in a prison setting."

¶ 11 Also in May 2017, the State filed a motion to allow the hearsay statements of J.C. and M.C. to be admitted at trial under section 115-10 of the Code of Criminal Procedure of 1963 (Criminal Code) (725 ILCS 5/115-10 (West 2016)). During a hearing on the motion, the State presented recorded interviews of the minors conducted at the Children's Advocacy Center (CAC) by Jessica Bolton, a child forensic interviewer. It also presented testimony from Ashley, Foster, and the minors' paternal grandfather, who was also defendant's grandfather. Ashley and Foster both described statements the minors made to them about the alleged sexual acts; however, the grandfather denied that the minors ever made any such statements to him. Ultimately, the trial court entered an order granting the State's motion as to the statements J.C. and M.C. made to Bolton, Ashley, and Foster. The court found the minors' statements were largely consistent with one another and stated the terminology used by the children and their descriptions of the alleged acts during the CAC interviews "added to the reliability of their statements." (Recordings of the minors' CAC interviews are not contained within the appellate record.)

¶ 12 In September 2017, defendant entered a partially negotiated guilty plea to count III of the charges against him. In exchange for his guilty plea, the State agreed to the dismissal of the remaining counts, the dismissal of his two pending traffic cases, a sentencing cap of 20 years, and that defendant could argue for "anything less" as allowed by statute. At the guilty plea hearing, the

trial court admonished defendant regarding the charge to which he was pleading, the possible penalties he faced, and the rights he would be giving up by pleading guilty. Upon questioning, defendant indicated he did not understand the difference between a jury trial and a bench trial, which the court further explained. Ultimately, however, defendant stated he understood the court's admonishments, that no threats or promises other than those in the partially negotiated agreement were made to him, he was given sufficient time to discuss the proposed plea agreement with both his attorney and his family, and he wished to plead guilty.

¶ 13   The State presented a factual basis that if the case proceeded to trial, J.C., who was under 13 years of age, would testify that between May and September 2016, defendant engaged in sexual contact with him on "some number of occasions" at their grandfather's residence. That contact included defendant "having [J.C.] touch [defendant] on and rub on [defendant's] penis." The State maintained it would also introduce testimony that during an interview at the sheriff's department, defendant admitted "that on at least one occasion [J.C.] had touched [defendant's] penis." It further noted defendant's date of birth was February 15, 1994, making him over 17 years of age at the time of the alleged offense. The trial court accepted defendant's plea, finding it was knowingly and voluntarily made.

¶ 14   In November 2017, defendant's presentence investigation report (PSI) was filed. According to the PSI, defendant was 23 years old with a criminal history that consisted of a prior juvenile adjudication for knowingly damaging property under $300 and a traffic violation for operating an uninsured motor vehicle. The PSI further showed that defendant was enrolled in special education classes in high school and graduated in 2013. Prior to his incarceration, he worked at a sawmill for three years and resided with his mother and stepfather.

¶ 15 Attachments to the PSI included police reports, an Illinois Department of Children and Family Services abuse/neglect report, and a hospital "alleged sexual assault victim report." According to those attachments, Ashley took J.C. and M.C. to the emergency room in November 2016 and reported that they had been sexually assaulted by their cousin approximately two months prior. The police responded, and Ashley informed them that sometime between June and September 2016, the minors told their grandfather that defendant had " 'touched' " them. The grandfather relayed that information to Ashley. When confronted, defendant and his mother denied that there had been any inappropriate behavior. At the time, Ashley was unsure whether to believe J.C. and M.C. because "they were inconsistent with their story."

¶ 16 In November 2016, the minors repeated their reports of sexual contact with defendant to Ashley. M.C. stated defendant " 'put her over a chair[,'] 'lubed up[,]' and penetrated her anally," threatening to kill her if she told anyone what had occurred. J.C. told Ashley the same thing happened to him and that he observed what defendant did to M.C. J.C. stated defendant threatened to hurt J.C. if he tried to help M.C. Additionally, J.C. reported to Ashley that defendant orally penetrated him and made both minors touch his " 'private parts,' " stating "he would 'break their wrists' if they stopped." Finally, J.C. told Ashley that the things he described "happened 'a lot of times.' "

¶ 17 The police reports further showed that Foster worked with defendant at the sawmill and asked defendant about the minors' allegations. According to Foster, defendant initially denied the allegations "but then did not respond further." Later, Foster received a Facebook message from defendant, stating " 'yes.' " Foster reported he then conversed with defendant over Facebook, asking him why he did that to the minors and defendant responded as follows: "I was in the wrong

and I will get some help[,] just don't call the cops that's all I say[.] And I will never go around them again[.] I'm sorry[.]" The messages Foster received from defendant also informed him that defendant was quitting his job at the sawmill and would return only to pick up his last paycheck. Foster took screen shots of the Facebook messages and gave them to the police.

¶ 18    The police additionally interviewed two of defendant and Foster's coworkers—Nathan Richards and Tony Westemeyer. Richards drove defendant and Westemeyer to and from work. In November 2016, Richards and Westemeyer learned about the minors' accusations against defendant and asked him whether they were true. According to the coworkers, defendant did not deny the allegations and stated, "the nine[-]year[-]old boy came out of the front room of the grandfather's residence and asked [defendant] to come to his bedroom." Defendant also stated the boy "had lube and asked [defendant] to have sex with him." When the police interviewed defendant, he denied that he had inappropriately touched the minors but became "fidgety" and nervous. When asked whether J.C. touched defendant's penis, defendant "reluctantly indicated that [it] may have happened once." Upon further questioning, defendant requested the presence of an attorney.

¶ 19    Summaries of the minors' CAC interviews showed both reported that defendant engaged in sexual contact with them at their grandfather's residence. M.C. made statements indicating defendant placed his penis in her mouth, anus, and vagina, while J.C. made statements indicating defendant placed his penis inside J.C.'s anus and mouth, and that defendant made both minors rub his penis with their hands. Each minor reported witnessing defendant engage in sexual contact with the other and indicated that the acts occurred more than once. J.C. stated he observed "white stuff coming from [defendant's] bad spot" on more than one occasion. Additionally, both

- 8 -

minors stated defendant threatened to kill them if they told anyone about what occurred. J.C. also reported that defendant threatened to break the minors' arms if they did not comply with his demands. According to the report, both minors stated they first reported the abuse to their grandfather.

¶ 20    Attachments to the PSI further included Dr. Killian's fitness evaluation, victim impact statements, and defendant's handwritten version of the offense. In his statement, defendant asserted he had been in a "secret relationship" with Ashley and asserted his belief that he had fathered her youngest child. He maintained that Ashley told J.C. and M.C. to lie about him to "get back at [him] for breaking up with her." Defendant stated he "did *not* touch any of [Ashley's] kids" and maintained he "only took the plea offer because [his] lawyer said it was best to take the plea so [he did not] have to spend the rest of [his] like [*sic*] in prison." (Emphasis in original.)

¶ 21    In February 2018, defendant underwent a sex offender evaluation with Dr. Jane Velez, a forensic psychologist and licensed sex offender evaluator. Dr. Velez diagnosed defendant with social anxiety disorder and borderline intellectual functioning. She described his cognitive ability as appearing "to be in the Extremely Low range per interview." Dr. Velez noted his testing scores indicated "a severe impairment in auditory memory and processing" and that he met the diagnostic criteria for Neurocognitive Disorder because he exhibited "soft signs of brain damage and impairment in the Left Temporal Lobe."

¶ 22    According to Dr. Velez, defendant reported that he pleaded guilty "to avoid a harsher sentence" and not " 'spend [his] whole life in prison' "; however, he "now want[ed] to change his plea deal to Not Guilty." She stated defendant appeared to have difficulty admitting to the offense because it did "not fit his standard of conduct for his own behavior as a moral person

who would never hurt children" but he did display appropriate victim empathy. Further, Dr. Velez determined defendant was "at Low Risk of Recidivism" and stated he did "not appear to meet the diagnostic criteria for Pedophilia." She recommended that when imposing defendant's sentence, the trial court consider those factors along with defendant's cognitive impairment, victim empathy, family support, and lack of prior criminal history. Dr. Velez stated that defendant's level of impairment was significant to the court's decision, stating as follows:

> "[I]ndividuals with cognitive and/or Neurocognitive impairment are known to do very poorly in a prison setting. They are likely to be taken advantage [of] and abused by other inmates and do not know how to, or are unable to, ask for help or assistance in the prison setting, which is quite intimidating to individuals like [defendant]. The court would be doing justice and showing mercy by allowing [defendant] to serve his sentence in the home of his mother and only leaver [*sic*] the home for sex offender treatment, thus protecting the vulnerable population."

¶ 23 In June 2018, defendant's sentencing hearing was conducted. At the outset of the hearing, Anthony Cameron, defendant's counsel, indicated there was a "problem" with defendant's written version of the offense, in that it was "prepared by somebody other than \*\*\* defendant." He called defendant to testify on his own behalf and address that issue. Defendant agreed that he had trouble putting documents together and that his mother helped him prepare his written version of the offense. Defendant stated that words in the document were his mom's words and agreed that he pleaded guilty in September 2017 because he was, in fact, guilty.

¶ 24 Defendant further acknowledged that his written version of the offense stated he "did *not* touch any of [Ashley's] kids." (Emphasis in original.) However, when questioned by

- 10 -

Cameron regarding where the statement came from and whether it represented his position, defendant twice provided no response. Ultimately, he reiterated that his "[m]om helped" him with his written version of the offense and indicated "[t]hat line" did not come from him. When asked whether he was taking the position that he did not "touch any of [Ashley's] kids" or if he was "standing on [his] plea," defendant indicated he wanted to stand on his plea. On cross-examination by the State, defendant testified the written version of the offense was in his handwriting.

¶ 25        The record reflects neither party submitted any additional evidence at the sentencing hearing. In presenting its argument to the trial court, the State acknowledged legal authority for the proposition that a trial court could impose a sentence of probation for a disabled offender "even in a Class X situation." However, it argued such a sentence was unwarranted in defendant's case and asked the court to impose an 18-year prison sentence. Cameron argued that imprisonment would pose an undue hardship to defendant given his cognitive impairment and asked the court to sentence him to a term of probation or, alternatively, a minimum six-year prison sentence.

¶ 26        The trial court agreed with the State and sentenced defendant to 18 years in prison. In setting forth its ruling, the court noted the facts of the case as contained in the PSI and the specific allegations of abuse, which it characterized as "horrific." Recalling its review of the minors' CAC interviews, the court found the assertion that Ashley coerced the minors' into fabricating the allegations against defendant was "just not credible to the court." Specifically, it noted the minors' statements were consistent with one another and consistent over time. It stated it did not believe the children's stories were made up given "the detail that they provided and also the corroboration between the children." The court also rejected the suggestion in the record that

someone other than defendant sent the Facebook messages to Foster, noting defendant acknowledged sending other messages regarding his employment around the same time.

¶ 27 The trial court further stated that although defendant had "some limitations," he had "a fairly good understanding" of the proceedings and it was clear that he understood what he did was wrong. It also noted defendant gave appropriate responses when discussing the allegations, *i.e.*, responses one "would expect someone to [give] if confronted with such an accusation." The court then found a sentence of probation would deprecate the seriousness of the offense and not serve the ends of justice. Further, the court stated that defendant, like any person going to prison, would face hardship and it did not find defendant's circumstances required it to sentence him to probation.

¶ 28 Regarding aggravating factors, the trial court found there was a "strong argument" that defendant's conduct caused or threatened serious harm. It referenced the victim impact statements, which set forth "issues that [J.C. had] been going through" and noted defendant's actions were something that would "stay with [J.C.] forever." Again, the court referenced the underlying facts of the case and that both minors reported that defendant had threatened them. The court found defendant "knew what he was doing was wrong when he did this" and sentenced him as stated.

¶ 29 Following his sentencing, defendant retained new counsel and, in July 2018, filed a motion to withdraw his guilty plea. He asserted he lacked the mental capacity to understand the significance or consequences of his guilty plea and that he was either misled or mistakenly believed that if he pleaded guilty, he would receive a sentence of probation and be allowed to go home. Defendant further argued that there was substantial doubt about his guilt and that the sentence he

received was excessive. He argued he intended to prove that his cell phone was stolen, he could not have sent the incriminating Facebook messages, and that the minors were "coached, rehearsed[,] and intimidated" into providing false statements against him.

¶ 30 In February 2020, the trial court conducted a hearing on the motion. Defendant testified on his own behalf. He recalled being represented by Cameron and pleading guilty. Defendant testified that Cameron told him if he pleaded guilty, he would get probation and be allowed to go home. Defendant stated he would not have pleaded guilty had he known he would not get probation.

¶ 31 Defendant also asserted that he was not guilty of the charged offenses. When asked whether he wrote a statement saying he "never touched those kids," defendant replied "[y]eah, I was helped." He specified that he was helped by his mother and that the statement was not true. However, on further questioning, defendant testified he was innocent of the charged offenses and that his written statement was the truth.

¶ 32 Defendant further testified that he was bullied by Foster, who he worked with at the sawmill. Defendant maintained he had previously had a relationship with Ashley, Foster's girlfriend, and there was a rumor going around the sawmill that defendant had fathered Ashley's youngest child. Foster was aware of the rumor and threatened to throw defendant in a woodchipper. He also told defendant to stay away from Ashley. Defendant denied sending the Facebook messages at issue in the case to Foster. He stated his cell phone went missing at work at 9 a.m. on the day the messages were sent, and he never saw his phone again. Because his phone disappeared at 9 a.m., he could not have sent the messages to Foster later in the day at 2:30 or 2:40 p.m.

¶ 33 On cross-examination, defendant acknowledged having a "pretty long

conversation" with Cameron before he pleaded guilty. He agreed he was in a room with Cameron for at least an hour and that he also talked to his parents "for a while." Defendant stated he decided he wanted to plead guilty to one count of the charges against him that involved J.C. Defendant acknowledged being interviewed by the police in November 2016, but did not recall admitting that J.C. had touched his penis. Defendant also remembered being interviewed by Dr. Killian, but he did not recall acknowledging to Dr. Killian that he sent Facebook messages to Foster about quitting his job. Finally, defendant testified that he usually worked at the sawmill until 2:30 p.m. and that it took him approximately 10 minutes to get home.

¶ 34　　　　　On redirect examination, defendant testified that in November 2016, his cell phone plan did not have "data." To use the internet, he had "to go down to the school." Defendant denied sending any of the Facebook messages attributed to him, stating that his phone was missing.

¶ 35　　　　　Defendant next presented the testimony of both Westemeyer and Foster. Westemeyer testified there were several reasons he believed defendant may have been "framed." Specifically, he testified defendant had been "scared" and was informed by Foster that "if he told the truth" or "confessed," then "the cops wouldn't be called." Westemeyer acknowledged providing a statement to the State that he remembered defendant having his cell phone on the day the Facebook messages were sent to Foster. However, since the relevant incident occurred approximately two years before, he no longer recalled defendant having his phone. Westemeyer further denied that he tried to show cooperation with the State in an attempt to help with his own pending criminal cases.

¶ 36　　　　　Additionally, Westemeyer recalled hearing rumors at the sawmill around November 2016 that Ashley was carrying defendant's child. He stated Foster reacted jealously to

those rumors and agreed that Foster could get pretty angry.

¶ 37　　　　　On cross-examination, Westemeyer acknowledged speaking with the prosecutor in defendant's case in September 2017, when the prosecutor was preparing for defendant's trial. He agreed reporting that sawmill employees routinely joked with one another and that defendant would typically get mad or angry about the jokes. At some point, Foster questioned defendant about "touching those kids." Westemeyer stated he believed Foster was joking but defendant began to act scared and nervous. Further, he stated that if he reported to the prosecutor that defendant had his phone on the day the Facebook messages were sent, then he was sure defendant had it because he "had more chance remembering then than [he] did now." On redirect examination, Westemeyer testified he was aware that defendant did not have "data" on his phone and had to rely on "public wifi."

¶ 38　　　　　Foster testified and identified a Facebook posting he made in February 2017, which was admitted into evidence. In the posting, Foster shared screen shots that were sent to him of messages between what he identified as a "fake" Facebook account that was using his name and an unidentified individual. In the messages, the unidentified person accused Foster of fabricating the allegations against defendant and bullying him into confessing. The account utilizing Foster's name responded by acknowledging he could get in trouble for making "a false report" and indicating he just wanted defendant to leave his girlfriend alone. Foster testified he posted the screen shots of the messages from the "fake" account to his legitimate Facebook account to ask how someone could "fake pictures like that." He further testified that he recently learned there was a website where messages could be sent "under someone else's name." Foster stated he was angry about the "fake" messages but did not contact law enforcement, a lawyer, or Facebook about the

issue.

¶ 39    Foster further acknowledged knowing that before he and Ashley "got together," she had "some kind of relationship" with defendant. He denied being jealous or bothered by that relationship because it predated his own relationship with Ashley, and defendant "didn't run around the [saw]mill throwing [that previous relationship] in [Foster's] face." Foster stated he was also aware of a rumor that defendant was the father of Ashley's youngest child. He stated he asked Ashley if there was a "chance" the child could be defendant's and she replied, " '[n]o.' " Foster added that deoxyribonucleic acid (DNA) testing confirmed that defendant did not father Ashley's child. On cross-examination, Foster agreed there had been a lot of drama surrounding defendant's case and a lot of comments made on Facebook.

¶ 40    Finally, defendant additionally presented testimony from his mother and stepfather, Violette and Luther Davis. Defendant's mother testified that when she and defendant's stepfather spoke to defendant before his plea, Cameron told them they had five minutes to make a decision. She testified defendant expected to get probation if he pleaded guilty and "thought he was coming home." Although she tried to convince defendant that he was mistaken, defendant persisted in his thinking and was adamant about what he expected to occur. On cross-examination, defendant's mother acknowledged that Cameron stated probation was a possibility and he would argue for it but that defendant would probably not get probation. On redirect examination, Davis described defendant as the type of person who gets an idea in his head and "won't shake it."

¶ 41    Defendant's stepfather testified that prior to defendant's guilty plea, he and defendant's mother met with Cameron and defendant for above five minutes. He stated defendant "expected to get probation and to come home" if he pleaded guilty because that was what Cameron

told them would happen.

¶ 42	In responding to the motion, the State asked the court to take judicial notice of the transcripts of defendant's guilty plea hearing and sentencing hearing, and the parties agreed the court could rely on its prior review of the minor's CAC interviews. The State also called Cameron as a witness. Cameron testified he had been an attorney for 48 years and had experience dealing with clients who were fit but had "some limitations." He estimated that he had represented 30 to 40 "borderline-fit people" and noted that as an undergraduate in college, he was an activities director at a camp for special needs children. Also, Cameron was familiar with Dr. Killian's evaluation of defendant and his opinion that it was necessary to "break[ ] things down for [defendant] to ensure that he understood." Cameron asserted that he carefully asked defendant questions to assure that his plea was knowing and voluntary. More specifically, when communicating with defendant, Cameron would say two or three short, declarative sentences and then ask defendant to give his own "take" on what Cameron had said.

¶ 43	Cameron described "a flurry of activity" in defendant's case prior to his guilty plea. He recalled that on September 27, 2017, the day before defendant pleaded guilty, the State mentioned the possibility of a negotiated plea and tendered some terms for "discussion purposes." Cameron then spoke with defendant in a conference room at the courthouse for about an hour. Thereafter, defendant's mother and stepfather were called into the room, and Cameron talked to them with defendant for 10 to 15 minutes. After that conversation, defendant spoke to his mother and stepfather alone inside the conference room.

¶ 44	Cameron noted the State had offered "a cap and a plea to one of the counts," which would have avoided defendant's risk of a natural life sentence. He stated he wanted defendant "to

at least consider something that would keep him from not having any of his vital youth left when he would get out of the [D]epartment of [C]orrections should he be convicted." After the conference room meetings, Cameron was instructed to seek a reduction of the offered sentencing cap. Cameron stated the instruction initially came from defendant but that defendant's stepfather "finished the sentence for him." Cameron confirmed with defendant that the instruction he received was what defendant wanted him to do. He denied ever telling defendant that he had to take a plea or that he would definitely get probation or "go home" by pleading guilty. He testified he told defendant only that probation might be a possibility in defendant's unusual circumstances.

¶ 45          On cross-examination, Cameron agreed that defendant was "impaired" and noted that "very early on" in the case, defendant was attacked and injured in jail. Despite defendant's impairment, Cameron did not believe defendant had the impression that a probation sentence was likely in his case. Instead, it appeared that defendant understood he would probably do "some time but that probation was a possibility." Cameron conceded that it was "not impossible" that defendant "might have been dreaming of" such an outcome. However, Cameron did not believe anything that was said during his conversations with defendant would have given defendant that idea. Cameron testified he had no recollection of defendant's mother stating that defendant believed he was "gonna go home if he pleads guilty." Also, he did not observe defendant to be mentally fatigued by their plea conversations.

¶ 46          Cameron clarified that during plea negotiations, the first sentencing cap offered by the State was for 25 years. When discussing the State's offer, defendant started telling Cameron that he would "do the plea to one thing" if the cap was lowered; however, defendant had difficulty with the word "cap" or the word "lowered" and "gestured in a downward manner as if to suggest

- 18 -

he wanted the possible years reduced" before his stepfather finished his sentence. Cameron recalled that it was defendant "who said the numeral 20." After the State agreed to lower the sentencing cap to 20 years, Cameron spoke with defendant again to determine if he wanted to plead guilty. Defendant "said he wanted to do it," and Cameron informed the State of defendant's acceptance of its offer. On redirect examination, Cameron testified he was convinced that defendant's guilty plea was knowing, intelligent, and voluntary.

¶ 47    Finally, the State presented the testimony of Mike Starman, who, in November 2016, worked as a sheriff's deputy and interviewed defendant in connection with the underlying allegations. During the interview, defendant denied having any sexual contact with M.C.; however, when Starman asked defendant whether J.C. had ever touched defendant's penis, defendant "shook his head up and down simulating yes" and stated " 'Yes, he has.' " On cross-examination, Starman stated he did not remember the exact wording defendant used but he understood defendant to affirmatively state that J.C. had touched defendant's private parts.

¶ 48    The trial court took the matter under advisement and, in March 2020, entered a written order denying defendant's motion to withdraw his guilty plea. In its written order, the court stated it had considered the record of proceedings, the evidence presented in court, the CAC interviews of the children, and the arguments of counsel.

¶ 49    In setting forth its decision, the trial court first rejected defendant's claim that his plea was not entered into knowingly and voluntarily. It described Cameron's testimony regarding the plea proceedings and noted Cameron's opinion that defendant's plea was intelligently, knowingly, and voluntarily made. The court found Cameron was a credible witness and stated it was "grateful" defendant had hired Cameron to represent him. It stated that if it "was going to

- 19 -

appoint an attorney to represent a [d]efendant with limited mental capacity," it would appoint Cameron, and it noted Cameron's experience as both an attorney and in working with individuals with mental impairments. The court stated the testimony of defendant's mother and stepfather, which contradicted Cameron's testimony, was not "at all credible" and its own recollection of the proceedings leading up to defendant's plea was consistent with Cameron's statement of what occurred.

¶ 50        The trial court also rejected the argument that there was substantial doubt of defendant's guilt. It noted defendant admitted one of the allegations against him to the police but denied others, providing "some additional weight to [his] admission." Further, the court stated it found J.C.'s CAC interview "to be credible," noting "there were consistencies in both children's interviews" as set forth in its previous order and during defendant's sentencing hearing. The court also concluded that defendant did send the Facebook messages to Foster, indicating the truth of the allegations against him. The court noted that, as argued by the State, defendant previously admitted sending some of the messages during his interview with Dr. Killian. Further, it rejected defendant's theory that the messages were sent by Foster or someone else took defendant's phone, describing that theory as "too speculative" and finding it was not "credible that someone like ***" Foster stole [defendant's] phone and then began sending [those] messages." Finally, the court stated it had reviewed the transcript of defendant's sentencing hearing and found the 18-year sentence it imposed "to be appropriate."

¶ 51        This appeal followed.

¶ 52                            II. ANALYSIS

¶ 53                    A. Deficiencies in Defendant's Briefs

¶ 54        On appeal, the State notes defendant's failure to comply with Illinois Supreme Court Rule 341 (eff. May 25, 2018), which sets forth the requirements for the form and content of appellate court briefs. Under that rule, an appellant's brief should include a "Statement of Facts" that "contain[s] the facts necessary to an understanding of the case, stated accurately and fairly without argument or comment, and with appropriate reference to the pages of the record." Ill. S. Ct. R. 341(h)(6) (eff. May 25, 2018). An appellant's brief must also have an "Argument" section "contain[ing] the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on." Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018). "Evidence shall not be copied at length, but reference *shall be made to the pages of the record on appeal* where evidence may be found." (Emphasis added.) *Id.*

¶ 55        In this instance, defendant presented a one-sided "Statement of Facts" that omitted many of the facts necessary to an understanding of his case. He failed to provide a full account of the underlying proceedings before the trial court, including a description of the charges against him, or even discuss the court's pertinent rulings. Although defendant challenges his sentence on appeal, his statement of facts contains little information relative to his sentencing hearing, the court's findings, or the sentence it imposed. Defendant also sets forth several facts without proper citation to the appellate record.

¶ 56        Additionally, although defendant repeatedly references portions of the record in the "Argument" section of his brief, he provides almost no citation to the appellate record in that section. Further, upon our own review of the record, we find portions of defendant's argument inaccurately describe the sequence of events before the trial court. In particular, defendant confusingly argues in his appellant and reply briefs that Cameron improperly "cross-examined"

- 21 -

him prior to the court's acceptance of his guilty plea. In his reply brief, he argues as follows:

> "Defense counsel at the guilty plea hearing struggled at length to pry the guilty plea out of [defendant]. It is radiantly apparent from the transcript of the guilty plea hearing that [d]efendant was extremely reluctant to say the words defense counsel aggressively sought to elicit from him. Defense counsel cross-examined and sought to impeach his own client at many points[.]"

However, the transcript of the guilty plea hearing, which occurred in September 2017, does not contain any examination of defendant by Cameron, nor does it indicate any reluctance by defendant in pleading guilty. At defendant's sentencing hearing in June 2018, Cameron did question defendant on *direct examination* regarding the written version of the offense attached to his PSI, but such examination occurred well after defendant tendered his guilty plea and it was accepted by the court. Ultimately, there is no support in the record for defendant's suggestion that Cameron "aggressively" pressured him on the record at the guilty plea hearing.

¶ 57 We note "this court is not a depository into which the appellant can dump his burden of argument and research." *People v. Snow*, 2012 IL App (4th) 110415, ¶ 11, 964 N.E.2d 1139. Further, "[t]he rules of procedure concerning appellate briefs are not mere suggestions, and it is within this court's discretion to strike the plaintiff's brief for failing to comply with Supreme Court Rule 341." *Crull v. Sriratana*, 388 Ill. App. 3d 1036, 1045, 904 N.E.2d 1183, 1190 (2009). Here, despite the deficiencies in defendant's briefs, we find our review of his claims is not overly frustrated. Accordingly, although we caution defendant regarding the necessity of complying with the requirements of Rule 341, we also find it appropriate to address the merits of his claims on appeal.

¶ 58                          B. Knowing and Voluntary Guilty Plea

¶ 59          On appeal, defendant first argues his plea was not knowingly and voluntarily entered. He contends that either because of Cameron's assurances or his own severely limited mental capacity, he pleaded guilty based on the mistaken belief that "he would be granted probation and released to go home."

¶ 60          To be valid, a guilty plea must be voluntary and intelligent. *People v. Guzman*, 2015 IL 118749, ¶ 21, 43 N.E.3d 954. "Generally, due process requires that in order for a defendant to knowingly and voluntarily plead guilty, a defendant must be advised of the direct consequences of a guilty plea." *People v. Hughes*, 2012 IL 112817, ¶ 35, 983 N.E.2d 439.

¶ 61          Additionally, "[a] defendant has no absolute right to withdraw his guilty plea" and, instead, "must show a manifest injustice under the facts involved." *Id.* ¶ 32. "Withdrawal is appropriate where the plea was entered through a misapprehension of the facts or of the law or where there is doubt as to the guilt of the accused and justice would be better served through a trial." *Id.* "[T]he decision to grant or deny a motion to withdraw a guilty plea rests in the sound discretion of the circuit court and, as such, is reviewed for abuse of discretion." *Id.* "An abuse of discretion will be found only where the court's ruling is arbitrary, fanciful, unreasonable, or no reasonable person would take the view adopted by the trial court." *People v. Delvillar*, 235 Ill. 2d 507, 519, 922 N.E.2d 330, 338 (2009).

¶ 62          Further, "[a] defendant is fit to stand trial, plead, or be sentenced if he is able to understand the nature and purpose of the proceedings against him and to assist in his defense." *People v. Johnson*, 206 Ill. 2d 348, 361-62, 794 N.E.2d 294, 303 (2002). "Generally, limited intellectual ability, without more, does not render a defendant unfit." *People v. Shanklin*, 351 Ill.

- 23 -

App. 3d 303, 306, 814 N.E.2d 139, 143 (2004).

¶ 63    Here, the trial court rejected defendant's contention that his guilty plea was not knowingly and voluntarily entered. The record contains sufficient support for the court's decision, and its ruling was not arbitrary, fanciful, or unreasonable.

¶ 64    It is undisputed that defendant had a low IQ and was intellectually impaired. However, shortly following the State's filing of charges against him, defendant underwent a fitness evaluation with Dr. Killian and was deemed fit to stand trial. We note that at the hearing on defendant's motion to withdraw his plea, the State asked the court to take judicial notice of the transcript of defendant's sentencing hearing and, without objection, presented argument regarding Dr. Killian's evaluation report, which was attached to the PSI. In his report, Dr. Killian stated defendant "demonstrated an adequate understanding of the nature and purpose of the proceedings against him." He noted defendant was able to convey that he was "charged with 'touching' " the victims in the case and accurately described some of the specific allegations against him. According to Dr. Killian, defendant knew what he was accused of doing was wrong and that he faced "serious" charges and a lengthy prison term. Further, defendant "was able to maintain his story of innocence despite [Dr. Killian] pushing him *** regarding the allegations."

¶ 65    At the hearing on the motion to withdraw defendant's guilty plea, Cameron testified regarding his experience in working with mentally impaired individuals. He described the underlying guilty plea proceedings, including his discussions with defendant and defendant's family members. The record reflects that when conversing with defendant, Cameron employed a method of communication similar to that recommended by Dr. Killian to ensure defendant's understanding. Specifically, Cameron stated he spoke in short sentences and had defendant repeat

the information back using his own words. According to Cameron, defendant conveyed, with some assistance from his stepfather, that he wanted a lower sentencing cap than initially offered by the State and he explicitly identified "20" years as the desired cap. Cameron denied telling defendant he had to plead guilty or that, by pleading guilty, he would get probation and "go home." He also did not believe that defendant held that impression, stating he was convinced that defendant's guilty plea was knowing, intelligent, and voluntary.

¶ 66　　　　Thus, although the record shows defendant was intellectually impaired, it also reflects that he had the capacity to understand, and did understand, the nature of the charges against him and the consequences he faced by pleading guilty. The transcript of the guilty plea hearing reflects only that defendant was properly admonished and entered a knowing and voluntary plea. Additionally, Cameron's testimony that defendant requested a lower sentencing cap during plea negotiations indicates both his understanding of the proceedings and ability to assist his counsel and advocate on his own behalf.

¶ 67　　　　Further, in denying defendant's motion to withdraw his guilty plea, the trial court explicitly found Cameron's testimony—not the contradictory testimony of defendant's mother and stepfather—was credible. We note the court was in the best position to make that determination as it heard the witnesses' testimony and was familiar with the underlying proceedings. Also, we find its conclusion supported by the record, which shows defendant's mother and stepfather also testified inconsistently with one another. Accordingly, under the circumstances presented, the court did not abuse its discretion in finding defendant's guilty plea was knowing and voluntary and not based on misapprehension of law or fact.

¶ 68　　　　C. Actual Innocence or a Defense Worthy of Consideration

¶ 69        On appeal, defendant next argues that he should be allowed to withdraw his plea because he is actually innocent of the offense to which he pleaded guilty. He argues that not only may a plea be withdrawn because it was entered through a misapprehension of facts or law, but also when a "defendant has a defense worthy of consideration" or "there is doubt of the guilt of the accused and the ends of justice would better be served by submitting the case to a trial." See *People v. Worley*, 35 Ill. 2d 574, 576, 221 N.E.2d 267, 269 (1966). Defendant asserts that in the present case, his innocence was demonstrated by Dr. Velez's opinion that he did not meet the diagnostic criteria for pedophilia and evidence showing he was "framed" by Foster.

¶ 70        Initially, the State responds that having a "defense worthy of consideration" is not a proper basis for permitting the withdrawal of a defendant's guilty plea. It points out that this court recently addressed that precise language, finding it was not included in recent case authority and had not been used by the supreme court since 1993. *People v. Nieto-Roman*, 2019 IL App (4th) 180807, ¶ 33, 152 N.E.3d 547. Ultimately, we held "the supreme court no longer recognizes the defense worthy of consideration language as a separate basis for allowing a defendant to withdraw his guilty plea." *Id.* We agree with the State and abide by our holding in *Nieto-Roman*. Accordingly, we consider only whether defendant should have been permitted to withdraw his plea because "there is doubt as to [his] guilt ***and justice would be better served through a trial." *Hughes*, 2012 IL 112817, ¶ 32.

¶ 71        Again, "the decision to grant or deny a motion to withdraw a guilty plea rests in the sound discretion of the circuit court and, as such, is reviewed for abuse of discretion." *Id.* "An abuse of discretion will be found only where the court's ruling is arbitrary, fanciful, unreasonable, or no reasonable person would take the view adopted by the trial court." *Delvillar*, 235 Ill. 2d at

- 26 -

519. Here, the trial court rejected defendant's contention that there was doubt as to his guilt and found his claims of being "framed" by Foster were "too speculative." We find the court's decision was supported by the record and not an abuse of discretion.

¶ 72    First, Dr. Velez's opinion that defendant did not meet the specific diagnostic criteria for pedophilia does not establish his innocence. As argued by the State, such a finding does not obviate the possibility that someone also possesses the ability to commit a sexually predatory act such as charged in the instant case.

¶ 73    Second, in reaching its decision, the trial court relied on its review of the minors' statements during the CAC interviews, which it found were credible and consistent. In previously addressing those interviews at defendant's sentencing hearing, the court found it was "not credible" that the minors had been coerced into fabricating the allegations, noting "the detail" they had provided regarding the abuse. Although the record does not contain the recordings of the CAC interviews, materials attached to the PSI did summarize the interviews and support the court's findings as to their consistency and level of detail. The court further noted that evidence showed defendant was interviewed by the police and, although he denied most of the minors' allegations, he did admit to the specific allegation to which he pleaded guilty.

¶ 74    Additionally, the trial court concluded defendant also sent the Facebook messages to Foster containing admissions of his guilt. As noted by the court, although defendant testified he could not have sent the messages because his phone was missing, he previously admitted to Dr. Killian that he sent other messages regarding his employment around the same time. The evidence further indicated Westemeyer previously reported observing defendant with his phone around the time the messages were sent.

¶ 75       Under the circumstances presented, the trial court's determination was not arbitrary, fanciful, or unreasonable. It committed no error in rejecting defendant's claim of innocence and denying his motion to withdraw his guilty plea.

¶ 76                               D. Defendant's Sentence

¶ 77       Finally, on appeal, defendant argues the trial court abused its discretion by sentencing him to a term of imprisonment rather than probation. He contends that given his limited mental capacity, he would suffer excessive hardship in prison and be vulnerable to abuse. Defendant notes Cameron's testimony at the hearing on the motion to withdraw his guilty plea indicated he was physically assaulted in jail. Additionally, he contends his case is comparable to *Watters*, 231 Ill. App. 3d 370, where a similarly disabled defendant "was granted probation for a Class X felony." Defendant maintains the court drew impermissible distinctions between his case and *Watters* that had the effect of punishing him for the exercise of his constitutional rights.

¶ 78       The Illinois Constitution states that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. "In determining an appropriate sentence, a defendant's history, character, and rehabilitative potential, along with the seriousness of the offense, the need to protect society, and the need for deterrence and punishment, must be equally weighed." (Internal quotation marks omitted.) *People v. Lawson*, 2018 IL App (4th) 170105, ¶ 33, 102 N.E.3d 761. On review, the trial court's sentencing decision is given substantial deference and will not be modified absent an abuse of discretion. *People v. Snyder*, 2011 IL 111382, ¶ 36, 959 N.E.2d 656.

¶ 79       Here, defendant pleaded guilty to one count of predatory criminal sexual assault of a child, a Class X felony that subjected him to a sentencing range of 6 to 60 years in prison. 720

- 28 -

ILCS 5/11-1.40(a)(1), (b)(1) (West 2016). Additionally, as acknowledged by the parties and the trial court below, the Criminal Code provides as follows with respect to sentencing dispositions for disabled offenders:

> "The court shall not impose a sentence of imprisonment upon the offender if the court believes that because of his disability a sentence of imprisonment would not serve the ends of justice and the interests of society and the offender or that because of his disability a sentence of imprisonment would subject the offender to excessive hardship." 725 ILCS 5/104-26(c)(1) (West 2016).

¶ 80 In *Watters*, 231 Ill. App. 3d at 375, the defendant, who was diagnosed with "[m]ild [m]ental [r]etardation," engaged in, and photographed, various sexual acts with young children. Some of the acts involved the defendant placing his penis inside the vagina of a four-year-old child. *Id.* at 376. He was arrested and charged with multiple counts of child pornography and aggravated criminal sexual assault after he took a roll of film to be developed at a pharmacy and the pharmacy contacted the police. *Id.* at 375.

¶ 81 During a stipulated bench trial on only one of the charges, evidence showed the defendant had an IQ in the rage of 64 to 67 and, upon his arrest, confessed to knowing the age of the children and photographing them for a period of four to six weeks. *Id.* at 376-77. Additionally, conflicting evidence was submitted regarding the defendant's ability to appreciate the wrongfulness of his conduct. *Id.* at 377. Ultimately, the trial court found the defendant guilty but mentally ill of aggravated criminal sexual assault. *Id.* Following a sentencing hearing, it imposed a six-year sentence, stating that although it believed the defendant " 'would otherwise be eligible for probation' " it did not have the authority to impose such a sentence for a Class X offender. *Id.*

at 379.

¶ 82        On appeal, the Fifth District determined the trial court erred in finding it lacked the authority to sentence the defendant to probation. *Id.* at 384-85. It held "[t]he language of section 104-26(c)(1) provides the trial court with discretion to either impose a sentence of imprisonment or forego such" where the circumstances set forth in that section are found. *Id.* at 384. Further, it held such discretion exists even when a defendant is being sentenced under a statute requiring mandatory imprisonment for a Class X offender. *Id.* at 384-85. Accordingly, the court vacated the defendant's sentence and remanded the matter to the trial court for a new sentencing hearing. *Id.* at 389.

¶ 83        As stated, defendant relies heavily on *Watters* in arguing the trial court should have sentenced him to a term of probation rather than imprisonment. Initially, we disagree with defendant's assertion that the court impermissibly distinguished *Watters* and that, in doing so, the court effectively punished him for exercising his constitutional rights.

¶ 84        At sentencing, the trial court noted the circumstances under which the defendant's conduct in *Watters* came to light and his confession after his arrest. Further, it compared those circumstances to defendant's actions in this case, which involved denials of the allegations against him and the request for an attorney during questioning by the police. Contrary to defendant's assertion on appeal that the court was punishing him for exercising his constitutional right to counsel, the court's comments, when taken in context, reflect it was making findings regarding the level of functioning of each defendant. Here, unlike the defendant in *Watters*, who naively incriminated himself by taking a roll of incriminating film to be developed and then explained his actions to the police, defendant threatened to kill his victims if they reported his actions, initially

- 30 -

denied any inappropriate conduct, and ended police questioning by asking for an attorney. As the court's comments suggest, these circumstances indicate defendant had a higher level of functioning or sophistication than the defendant in *Watters*. It was not impermissible for the court to rely on such circumstances when distinguishing the mental capabilities of the two defendants.

¶ 85 More significantly, however, we find defendant mischaracterizes the holding of *Watters* on appeal. In arguing the two cases are similar and warrant the same outcome, defendant asserts, without citation, that the defendant in *Watters* "was granted probation for a Class X felony." This statement is incorrect. As set forth above, in *Watters*, the Fifth District determined the trial court erred in finding it lacked authority to impose a probation sentence because the defendant was a Class X offender and otherwise subject to mandatory imprisonment. *Id.* at 384-85. It vacated the defendant's sentence and remanded for a new sentencing hearing, stating as follows:

> "By our reversal we do not mean to mandate the type of sentence the trial court should impose. We do, however, wish to make it clear that the court has the discretion to choose the alternative disposition of probation in this case even though the defendant has been convicted of a Class X felony." *Id.* at 389.

¶ 86 Clearly, *Watters* did not require the trial court to impose a sentence of probation in that case. Nor does it require such in this case. It simply stands for the proposition that under section 104-26(c)(1) of the Criminal Code, a trial court has "discretion to choose the alternative disposition of probation" even when sentencing a Class X offender who would otherwise face a mandatory prison sentence. *Id.* Consistent with *Watters*, the trial court in this case acknowledged that discretion.

¶ 87 Ultimately, the record reflects the trial court considered appropriate factors when

determining defendant's sentence. It found the hardship to defendant in going to prison would be the same as any other person imprisoned for a child sex offense and that probation would deprecate the seriousness of the offense and not serve the ends of justice. The court's comments reflect a finding that defendant understood the wrongfulness of his actions. It described the underlying circumstances of the offense as "horrific," noted defendant threatened the minors, and found defendant's conduct threatened serious harm to J.C. Further, although defendant notes Cameron's testimony that defendant was "attacked" in jail at some point early on in the case, no further context was offered for that incident, and no evidence was presented establishing any connection between the attack and defendant's mental deficiencies.

¶ 88 Although the trial court had discretion to choose probation as a sentencing alternative under section 104-26(c)(1) of the Criminal Code, it was not required to impose such a sentence. As argued by the State, "[t]he totality of the *** court's statements clearly indicate[ ] that it reasonably concluded that defendant's particular circumstances and criminal actions should merit a prison sentence rather than probation." Under the facts presented, we find no abuse of discretion by the court in that determination.

¶ 89                                    III. CONCLUSION

¶ 90         For the reasons stated, we affirm the trial court's judgment.

¶ 91         Affirmed.